## MDO DEVELOPMENT CORPORATION, Plaintiff,

### v.

## Patrick J. KELLY and Debra B. Kelly, Defendants.

### No. 87 Civ. 0068 (RPP).

United States District Court, S.D. New York.

Nov. 28, 1989.

---

Burns & Beck by John M. Burns, III, New York City, for plaintiff.

Adler & Klein by Herbert Adler, New York City, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiff MDO Development Corporation ("MDO") claims that defendant Patrick Kelly embezzled from MDO's restaurant, The Water Club (the "Club"), at least $485,-000 starting in late 1983 and continuing until December, 1986 and that Mr. Kelly also accepted commercial bribes. MDO further claims that Mr. Kelly and Debra B. Kelly ("Mrs. Kelly") applied the proceeds of the embezzlements to the acquisition of land in Greenwich, Connecticut and the construction of a house (the "House") on the land. MDO seeks restitution on the theory of unjust enrichment and conversion, punitive damages and, pursuant to the Racketeer Influenced Corrupt Organizations Act of 1970 ("RICO"), treble its actual damages and its attorneys' fees. It also seeks the impressment of a trust on the House and land.

Mr. and Mrs. Kelly claim that the funds taken were part of general skimming operations at The Water Club, were permitted by its owner and operator, MDO, and that the funds taken were reimbursements to Mr. Kelly for expenditures he made on behalf of The Water Club, or additional salary due him.

Mr. Kelly counterclaims for unreimbursed earnings and expenditures as the general manager of The Water Club and for defamation arising out of statements by MDO's officers that Mr. Kelly was discharged because he stole from The Water Club.

The matter was tried before this Court from July 26, 1989 to August 14, 1989. This opinion constitutes the findings of fact, conclusions of law, and decision of this Court.

Subject matter jurisdiction of this case is based on RICO, 18 U.S.C. § 1964, the Court's pendant jurisdiction, and diversity of citizenship. Plaintiff is a New York corporation. Defendants are citizens of Connecticut. The matter in controversy exceeds $10,000. Personal jurisdiction lies over the defendants because the transactions complained of were all initiated in the Southern District of New York. N.Y.C.P. L.R. § 302. For the same reason, venue is proper in this Court.

## I. SUMMARY OF THE FACTS

At all relevant times Michael D. ("Buzzy") O'Keeffe ("Mr. O'Keeffe") has owned 83%; Donald Evans has owned 10%; and Carmine Parisi has owned 7% of the capital stock of MDO, a corporation duly organized and existing under the laws of the State of New York. MDO owns and operates a public restaurant and banquet facility on the Manhattan waterfront known as The Water Club. Between 1982 and 1986

the banquet department of The Water Club employed numerous persons, including assistant banquet managers, a chef, captains, waiters, bus-boys and various support personnel. Certain of the files of The Water Club's banquet department were maintained on Water Club premises but separate from other Water Club records.

MDO, The Water Club and its banquet department were each engaged in interstate commerce and the activities of each has an effect on interstate commerce. The Water Club, including its banquet facility, has become the tenth largest grossing restaurant in the United States, drawing clientele primarily from New York, New Jersey and Connecticut. The Water Club purchases its supplies, particularly lobsters, directly from New England purveyors.

Prior to his employment by The Water Club, Mr. Kelly was employed as a banquet manager for the Tavern on the Green restaurant at an annual salary of $35,000, plus tips, commissions, a dining-out expense account and profit sharing.

At some time in 1982 prior to the opening of The Water Club in September 1982, Mr. O'Keeffe hired Mr. Kelly and he became the banquet manager of The Water Club. At the end of 1983 or 1984 Mr. Kelly also became general manager. His employment by The Water Club was terminated on December 19, 1986.

Mr. Kelly's termination came about after a lawyer representing the factoring organization which was arranging to replace Chemical Bank as MDO's prime lender discovered that his check in payment of a party in the banquet facility had been altered to add Mr. Kelly's name as a payee and then deposited in the Bank of Stamford in Connecticut. Mr. O'Keeffe was notified and he retained an investigator, Mr. Kerin, who interviewed Mr. Kelly. Mr. Kelly freely admitted using the funds and stated he had used many "third party checks" for himself and to pay creditors of The Water Club. He maintained that Mr. O'Keeffe had approved the use. Mr. Kelly asked Mr. Kerin to bring in Mr. O'Keeffe so that he could verify what Mr. Kelly was saying.

Mr. O'Keeffe did not respond to the invitation.

Mr. Kerin then questioned other banquet staff who stated they knew that "third party checks" were being altered and believed management, particularly Mr. O'Keeffe, was aware of the practice.

MDO then made a complaint of theft by Mr. Kelly to the Manhattan District Attorney and, simultaneously, started this action.

The records of Mr. Kelly's banks revealed copies of ninety-one altered third-party checks which had been deposited by Mr. Kelly. He freely admitted depositing those checks and states there may have been more. A jury trial was held on the criminal charges and Mr. Kelly was acquitted.

Plaintiff's Exhibit 6 contains a listing of a total of the ninety-one checks totalling $453,328.32. All of these checks were originally made payable solely to The Water Club by a Water Club customer in payment for a Water Club function in its banquet facilities; all of them were altered by Mr. Kelly to add himself as an additional payee; and all of them bear the endorsements in Mr. Kelly's hand, "Water Club" and "Patrick Kelly" (except for the two checks of Vincent Albanese totaling $10,814.17, which were given to Mr. Kelly as payment for a Water Club function with the payee and amount in blank and which Mr. Kelly filled out payable solely to himself).

Mr. Kelly testified at his deposition that altered checks amounting to $1475 were gratuities intended by the customer for him, not the Water Club, and plaintiff does not dispute the deduction of that amount from the total.

Thus, the totals of altered checks deposited by Mr. Kelly each year were:

| | | |
|---|---|---|
| 1983 | – | $ 2,000.00 |
| 1984 | – | 42,500.00 |
| 1985 | – | 33,577.53 |
| 1986 | – | 371,681.79 |
| Unknown | – | 2,094.00 |
| | | $451,853.32[1] |

---

1. Plaintiff seeks to include $33,214.93 of deposits made in 1985 which Mr. Kelly said at his

The investigations also revealed that Mr. Kelly had used third-party checks to pay creditors, such as Kosher caterers and party equipment rental companies utilized in connection with the party banquets at The Water Club.

Mr. Kelly's defense was that his use of the altered checks was initiated on instructions from Mr. O'Keeffe and authorized thereafter by Mr. O'Keeffe. He testified that the practice had been initiated by Mr. O'Keeffe because, if deposits of customer checks were made, the interest payments required by the bank loan agreement would have prevented timely payments of the outstanding bills of the subcontractors who had constructed The Water Club. He claimed the practice continued because the bank loan payment requirements had continued to cause cash flow problems and because of Mr. O'Keeffe's desire to avoid paying full sales taxes and making full rental payments to the City of New York, which were in part based on gross receipts.

Although his responsibilities were operational and not financial, Mr. Kelly displayed a considerable awareness of most aspects of The Water Club's business and its lease and financing arrangements. He testified that off-the-books cash payments in connection with running the business were also made by Mr. O'Keeffe and that he, Kelly, had advanced his own cash for the benefit of the Club in substantial amounts. The deposits of altered checks, he testified, were made as reimbursement for those advances, as well as for salary incentive payments and expense account money which were due but had not been paid.

In corroboration of his testimony, the record is undisputed that throughout the period from 1982 through 1986 The Water Club experienced cash flow problems. Most of The Water Club's financing was based on a substantial loan from Chemical Bank. However, according to The Water Club's financial records, Mr. O'Keeffe also contributed substantial funds to The Water Club, either as personal loans or as loans from Dircksen & Talleyrand, Inc., a corporation which he owned. At relevant year ends, the outstanding balances of Mr. O'Keeffe's loans were:

| | |
|---|---|
| 1982 | $ 664,684.00 |
| 1983 | 1,086,564.00 |
| 1984 | 922,691.00 |
| 1985 | 945,773.00 |
| 1986 | 1,032,527.00 |

MDO's owners deny Mr. Kelly had the authority to use the funds as he claims. Mr. O'Keeffe, the principal owner, is a man with significant restaurant experience, having owned several smaller restaurants in New York. At the relevant time period, he also owned and operated the River Cafe on the Brooklyn waterfront, and The Cafe at Grand Central, as well as a restaurant in Southampton. His most ambitious effort is The Water Club. Both Mr. Evans and Mr. O'Keeffe testified, however, to a most implausible state of affairs at The Water Club. Mr. O'Keeffe was cast as a man who never reviewed the financial books and records of the Club; nevertheless, he signed all checks. Indeed, his main interests were said to be decor and, secondly, quality of food. He maintained that he had understood that the tents, awnings, and party table and chair rentals utilized for banquets were supplied at no cost to the Club. He stated he had always wondered how their suppliers obtained payment. This testimony from an experienced New York restauranteur is not credible.

Mr. Evans' function was described as "trouble shooter." The testimony revealed his responsibilities were never clearly defined. His main role was opening the mail in the morning and arranging to have checks deposited as fast as possible so that other checks could be drawn to pay interest on the bank loan and on large bills of outstanding creditors. Mr. Parisi does not appear to have had any responsibilities.

## II.  DISCUSSION

The plaintiff's claims against Mr. Kelly fall into three different categories:

1.  the deposits to the Kellys' accounts of altered checks;

---

deposition "could be" other altered checks. The Court declines to so include that amount due to the absence of any additional proof that they were altered checks.

2. the payments to third parties—including Allen Party Rental and Metro Party Rental and caterers—by use of altered checks; and

3. the receipt of commercial bribes.

Plaintiff's claims will be discussed in reverse order.

■ MDO's position with respect to commercial bribes is tenuous. The clear preponderance of the evidence is that the moneys received by Mr. Kelly were commissions for recommending persons giving parties at The Water Club to purveyors of flowers, music, and entertainment. These supplies and services were extras and not part of the ordinary services supplied by The Water Club. Since The Water Club did not pay for such supplies or services or was always reimbursed by customers in the amount of the cost of the items, there is not sufficient evidence to entitle MDO to recover from Mr. Kelly for these commissions, as he referred to them. Mr. O'Keeffe testified that there was a well known policy at The Water Club against kickbacks, another way of characterizing such payments, but Mr. O'Keeffe's testimony was of a character to raise doubt about what policies, if any, existed. In any event, since the payments were not "commissions" on payments for services directly provided by The Water Club, it is not clear that any policy of The Water Club was violated or that it is entitled to recover, since any loss sustained was that of the party giver, not The Water Club.

■ Secondly, with respect to payments to third party creditors by use of altered checks, the Court is unable to find that the third-party creditors were not due the amounts paid them. In fact, all the evidence at trial demonstrated that The Water Club owed additional moneys to these creditors which were unpaid. During the trial, which was jointly tried with the case of Metro Party Rentals v. MDO, the Court found that Metro Party Rentals had proved its claim against The Water Club by a preponderance of the evidence, and that the plaintiff had been unable to carry its burden of proof of any fraud or RICO claim against Metro Party Rentals. MDO thereupon settled the claims of Metro Party Rentals against it during the trial.

Apparently from its inception, The Water Club's cash flow problems caused it to fail to pay its bills, other than those to preferred creditors, with the promptness of most businesses. Indeed, the evidence revealed that it was a practice to "stiff" many small creditors entirely. This sad state of affairs lends credibility to Mr. Kelly's testimony that the cash flow problems became so bad that checks were altered to pay important creditors of The Water Club at Mr. O'Keeffe's instigation or with his approval. At least some bills of the third-party creditors, particularly suppliers of tables and chairs, which were subsequently paid by altered checks, were received by the comptroller, Mr. Della Bove, and held in a drawer. The comptroller and his chief assistant knew these bills were warranted and that they would not be paid by The Water Club checks. Plaintiff's claim that neither Mr. Evans nor Mr. O'Keeffe were aware that suppliers of tents, tables and chairs were paid not by The Water Club checks but by third-party checks strains credulity.

It seems incongruous for an experienced restauranteur like Mr. O'Keeffe, who must have been aware of the methods used to skim from restaurants, not to have taken steps to ensure receipts for banquets were received by the comptroller's office and in the correct amount. Such steps would have prevented or revealed the use of third party checks. Banquets were scheduled and posted by customer name at the Club. The banquet department records were always available to MDO's officers. No records system was introduced to insure bills were fully corrected. No test audits were conducted. It is possible to conclude that the lack of close supervision of this aspect of the Water Club's business was deliberate. One banquet customer who testified complained to Mr. O'Keeffe that the check in payment of the banquet had been altered to add a third party and that Mr. O'Keeffe responded, "If you don't like it you can go elsewhere. That's the way we do business," or words to that effect.

The extent of the practice, if it existed, however, was not determinable from the evidence presented.

Altered third-party checks, of course, were never deposited and, thus, never reflected in receipts of the business. Mr. Kelly claims that this practice was authorized by Mr. O'Keeffe to avoid paying higher rent to the City of New York and to avoid certain taxes. It is not necessary, however, to ascertain the truth of Mr. Kelly's claim. It is enough to find that Mr. Kelly is not liable for those third-party checks which he altered to pay vendors of the plaintiff for services rendered. MDO was unable to prove by a preponderance of the credible evidence that it was damaged by third-party creditors receiving such checks. On the contrary, all the evidence indicates that these checks reduced The Water Club's liability, if any, for services rendered.

■ The remaining claim relates to Mr. Kelly's alteration of checks to add his own name and the deposit of those checks to his own account. As shown *supra* the amounts which have been acknowledged to have been received by Mr. Kelly are substantial, totalling $451,853.32. By far the largest part of these checks were altered and deposited in 1985 and 1986. Although plaintiff's officers' testimony lacked plausibility in many respects, Mr. Kelly's position that the total amount of checks altered in those two years were authorized by Mr. O'Keeffe defies reason. Mr. Kelly's own bank records indicate to the contrary and provide a more understandable reason for the check alterations and deposits.

In 1985 the Kellys purchased land in Greenwich, Connecticut for $325,000 and started constructing a house. During 1985 they spent a total of $485,000 for these purposes. During 1986, the Kellys spent $685,000 on the construction of the house, for a total land acquisition and construction cost of $1,170,000. $700,000 was supplied by two mortgage construction loans from the Bank of Stamford, leaving a balance of $470,000 spent from the Kellys' own bank accounts. Mr. Kelly claims the deposits, which allowed these payments of $470,000

from unborrowed funds, were moneys received by him in reimbursement for The Water Club expenses and that Mr. O'Keeffe was aware of these sums being repaid to him. The flaw in Kelly's testimony is that in order to pay expenses and be reimbursed for them, one has to have had the funds in the first place. Payment and reimbursement of expenses does not result in a net gain, let alone one of this magnitude. Kelly has made no adequate explanation of where he could have obtained such amounts. He did not point to previously acquired capital. The only source of outside funds he testified to were cash gratuities. Cash gratuities intended for him would have to have totaled around $120,000 a year over a four year period to fill the gap. Mr. Kelly's own testimony does not support such a figure. Nor does he explain where he kept the money he would have been required to amass in 1983 and 1984 in order to make the required expenditures of $470,000 in 1985 and 1986.

■ The Court finds these checks were the property of The Water Club and Mr. Kelly is liable to MDO in conversion for $451,853.32. The Court also finds that, in view of the application of said funds to the land purchase and house constructed in Greenwich that Mr. Kelly is liable to MDO for unjust enrichment in the same amount. Mrs. Kelly, as the joint owner of the house and land with her husband, was unjustly enriched by the embezzlements and is jointly and severally liable for that amount. Furthermore, because these funds were used by Mr. Kelly to purchase the land and construct a residence on it for the Kelly defendants in Greenwich, Connecticut, MDO is entitled to a judgment imposing a constructive trust in its favor in the amount of $451,853.32 on that property. *Republic of Philippines v. Marcos*, 806 F.2d 344, 355 (2d Cir.1986) *cert. denied*, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987).

■ Lastly, MDO and its banquet and party operations and personnel, including its banquet manager, Mr. Kelly, constitute an enterprise within the meaning of 18 U.S.C. § 1961(4). *U.S. v. Indelicato*, 865

F.2d 1370, 1382 (2d Cir.1989). That enterprise was engaged in interstate commerce and activities affecting interstate commerce in view of its purchase of lobsters and other supplies out of state and because its customers, particularly banquet customers, were shown to hail from, among other states, New York, New Jersey and Connecticut. Mr. Kelly transported stolen, forged and altered checks across state lines by taking checks from The Water Club and by depositing them, or causing them to be deposited, in the Bank of Stamford in Connecticut. These acts were a violation of 18 U.S.C. § 2314. *United States v. Block,* 755 F.2d 770 (11th Cir.1985); *United States v. Green,* 293 F.Supp. 999 (S.D.N.Y.1966). Mr. Kelly's acts of depositing approximately ninety-one checks with forged payees and endorsements constituted a continuing pattern of racketeering activity over a two or three year period in violation of 18 U.S.C. § 1962(c). *H.J. Inc. v. Northwestern Bell Telephone Co.,* —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (pattern of racketeering activity established by showing at least two related racketeering predicates which amount to continued criminal activity). The fraudulent acts were related to one another in that they were performed for a common purpose, the purchase of land and construction of a residence in Greenwich.

Accordingly, MDO is entitled to recover damages of $451,853.32 from Mr. Kelly. Additionally, the Court is required to treble those damages, and award plaintiff its attorneys' fees and expenses incurred in this action.[2] Thus, judgment shall be entered in the amount of $1,355,559.90. The Court will assess attorneys' fees and expenses if the plaintiff moves to amend the judgment to be entered herein.

■ The acts attributed to Mrs. Kelly are not found to constitute conversion or a pattern of racketeering activity sufficient to sustain a finding of a violation of 18

U.S.C. § 1962(c). The Court also declines to assess punitive damages in this action in view of plaintiff's conduct in operating its business and because the imposition of treble damages, as required by a RICO violation, is already sufficient punishment.

In view of the foregoing findings, Mr. Kelly's claim for defamation is dismissed, the assertions of the MDO officers having been found to be true.

■ Mr. Kelly's claims for back salary and expense reimbursement are dismissed as not recoverable because of his disloyalty to his employer during the period for which he is making those claims. *Lamdin v. Broadway Surface Advtg. Corp.,* 272 N.Y. 133, 138, 5 N.E.2d 66, 67 (1936); *Maritime Fish Products, Inc. v. World Wide Fish Products, Inc.,* 100 A.D.2d 81, 88, 474 N.Y. S.2d 281, 285 (1st Dep't 1984); *Sundland v. Korfund Co., Inc.,* 260 A.D. 80, 20 N.Y. S.2d 819 (1st Dep't 1940). As a result, it is not necessary for the Court to determine whether Mr. Kelly was entitled to reimbursement from MDO for $50 per party or for certain expenses he incurred on behalf of The Water Club. In that regard, however, the evidence of a forged signature on the alleged employment agreement was less than adequate.

With respect to Mr. Kelly's claimed unreimbursed expenses, certain expenses appeared to have been unreimbursed expenses which could have been properly chargeable to The Water Club for customer-related expenses or to improve employee relations. The Water Club's apparent policy of stiffing small customers and claimed unbusinesslike method of operations makes the Court unwilling to find that these amounts were not due to Mr. Kelly, but, because of his disloyalty, he is not entitled to be reimbursed for them.

In view of the Court's determination that a constructive trust shall be placed on the Kellys' residence, the Court declines to or-

---

**2.** The relevant RICO section provides:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and *shall* recover threefold the damages he sustains and

the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c) (emphasis added). Defendants have cited no case indicating the Court has discretion to impose less than treble damages.

der reinstatement of the prior *lis pendens* or to vacate the default judgment vacating said *lis pendens*.

Plaintiff is hereby ordered to submit a proposed judgment on 5 days notice to defendants, within 10 days of the date of the entry of this decision.

SO ORDERED.