Dorothy LOUGHMAN, et al., Plaintiffs,

v.

CONSOL–PENNSYLVANIA COAL CO., Consolidation Coal Company, Consol Land Development Company, the Monongahela Railway Company, Rheinbraun U.S. Corporation, Rheinische Braunkohlenwerke A.G., Marie Theresa Bergbaugesellschaft MHB, Ewing Pollock, Pollock Pollock & Thomas, The Upshur Agency, Inc., David Boggs, Mike Wilson and William Reese, Defendants.

Civ. A. Nos. 83–921, 83–1674 to 83–1679 and 83–1754.

United States District Court, W.D. Pennsylvania.

March 1, 1990.

Order On Post–Trial Motions June 18, 1990.

Louis M. Tarasi, Joseph Hinchliffe, Tarasi & Johnson, P.C., Pittsburgh, Pa., for plaintiffs.

Joseph A. Katarincic, Katarincic & Salmon, Pittsburgh, Pa., Joseph D. Becker, Holly Kennedy Passantino, New York City, Kathryn Simpson, James F. Manley, Pittsburgh, Pa., for defendants.

## MEMORANDUM

D. BROOKS SMITH, District Judge.

Defendants request reconsideration of their motions to grant judgment notwithstanding the verdict, originally submitted after these cases were tried to verdict in January and February, 1987. Pursuant to our order of January 31, 1990, the parties have provided us with supplemental briefs discussing the relevance of the evidence admitted at the original trial before Judge Teitelbaum in light of the United States Supreme Court's holding in *H.J. Inc. v. Northwestern Bell Telephone Co.*, —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Due to the unusual circumstances in which we find ourselves in this matter, *i.e.*, ruling on a motion for judgment notwithstanding the verdict in a matter over which we did not preside originally, we requested submissions by all parties outlining and highlighting the evidence of RICO violations. Because our review of the evidence presented at the original trial reveals that plaintiffs presented evidence of land acquisition activity lasting, at the longest, approximately one year, we will grant the defendants' motion for judgment notwithstanding the verdict on the grounds that such a showing does not meet the Supreme Court's standard for establishing a pattern of racketeering as set forth in *H.J. Inc.*

The standard for granting a motion for judgment N.O.V. is the same as that for a directed verdict. *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210 n. 5 (3d Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). See also *Wright v. Miller*, 9 Federal Practice & Procedure, § 2537. "The jury's verdict will be set aside only if manifest injustice will result if such verdict is allowed to stand. To grant such a motion the Court must find as a matter of law that there can be but one reasonable conclusion as to proper judgment." *Whitmore v. Bobst Group, Inc.*, 668 F.Supp. 421, 424 (E.D.Pa.1987) (citing *Woodward & Dickerson, Inc. v. Yoo Hoo Beverage Co.*, 502 F.Supp. 395, 397 (E.D. Pa.1980), *aff'd mem.*, 661 F.2d 916 (3d Cir. 1981)). We must view the evidence and all inferences thereupon in a light most favorable to plaintiff. *In re Air Crash Disaster at Mannheim, Germany*, 769 F.2d 115, 123 (3d Cir.1985), *cert. denied* 474 U.S. 1082, 106 S.Ct. 851, 88 L.Ed.2d 891 (1986), *reh'g denied*, 481 U.S. 1008, 107 S.Ct. 1636, 95 L.Ed.2d 208 (1987).

A. *The Racketeering Pattern Requirement*

1. The relatedness of the predicate acts.

In *H.J. Inc.*, the Supreme Court held that "to prove a pattern of racketeering activity

a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." 109 S.Ct. at 2900 (emphasis in original). In defining whether predicate acts are "related" under RICO, the Court sought guidance from a sister provision of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 922. Looking to Title X of the Act (RICO formed Title IX), the Court found the following language helpful: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)).

█ After reviewing the evidence, we are satisfied that sufficient evidence was admitted upon which the jury reasonably could have found that defendants' conduct toward the plaintiffs had the purpose and effect of acquiring a right of way for the railroad spur and involved the same participants, victims and methods of commission. This commonality passes muster under the *H.J. Inc.* relatedness standard. *H.J. Inc.,* 109 S.Ct. at 2901. See also *Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989) (separate acts involving separate properties are related for purposes of RICO when they involve same participants, same methods, common victim and are not isolated events).

### 2. *The continuity requirement.*

█ We also must determine that there was evidence that defendants' predicate acts extended over a substantial period of time or that they inherently posed a threat of future criminal activity. The Court held that to establish a RICO pattern, the predicates themselves must amount to, or otherwise constitute a threat of continuing racketeering activity. 109 S.Ct. at 2902. Proof that a RICO defendant has been involved in multiple criminal schemes is highly relevant to the inquiry, but not the only method of showing continuity. *Id.* at 2901. The Court directed that we make a case-by-case

determination, 109 S.Ct. at 2902, guided by the following principles:

'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with longterm criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* (citations omitted) (emphasis in the original). In essence, the Court held that before predicates form a RICO pattern, they must span a substantial period of time or, in the alternative, threaten long-term criminal activity. *Id.* at 2902 n. 4. Thus plaintiffs' evidence must have shown predicate acts which extended over a substantial period of time in excess of a few weeks or months or which somehow threatened future criminal conduct.

It has been noted that the degree of concrete guidance on defining continuity offered by the Supreme Court in *H.J. Inc.* is debatable. *Swistock v. Jones,* 884 F.2d 755, 757 (3d Cir.1989). We are not limited to the text of *H.J. Inc.* for guidance in this matter, however. In three subsequent decisions, the Court of Appeals for this Circuit has interpreted *H.J. Inc.'s* holding and has suggested when a period of activity is substantial under RICO. In the first case, *Swistock v. Jones,* 884 F.2d 755 (3d Cir. 1989), the Court reversed the district court's dismissal of plaintiff's complaint, finding plaintiffs' allegations that defen-

dants had committed numerous predicate acts of wire fraud and mail fraud for more than two years (*i.e.,* allegations of predicate acts spanning a period of approximately fourteen months combined with allegations of further misrepresentations approximately one year later) as well as alleged misrepresentations concerning other potential transactions in the future with plaintiffs were sufficient to allege a RICO pattern. *Id.* at 759.

In a second opinion issued less than one month after *Swistock*, the Court of Appeals found that the plaintiff in *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162 (3d Cir.1989), had pleaded a pattern of racketeering when she alleged that three perpetrators were involved in at least one open-ended scheme which lasted at least two years and had as its object the defrauding of numerous investors. *Id.* at 1166.

Finally, last month in *Marshall–Silver Construction Co. Inc. v. Mendel,* 894 F.2d 593 (3d Cir.1990), the court held that the district court properly dismissed a RICO complaint which alleged predicate acts lasting less than seven months and a scheme of alleged illegal activity which, on the facts alleged, posed no threat of additional repeated criminal conduct over a significant period. At 597. The Court of Appeals also cautioned that while continuity is a temporal concept, the time span is not the sole consideration. In doing so, the court indicated that in light of congressional intent behind RICO and the *H.J. Inc.,* holding, it would look for both temporal continuity as well as a significant societal threat. At 597.[1]

Keeping in mind that continuity is not only a temporal concept but also is evidenced by a societal threat of future criminal conduct, we will turn to the evidence at hand.

## B. *Plaintiffs' Evidence*

In these cases, plaintiffs' complaints identified the RICO violation as defendants' engaging "in fraudulently forcing individuals to sell their property for building a railroad for the purpose of hauling coal...." *E.g.,* Loughman (83–921) Amended Complaint ¶ 65. Likewise, in the pretrial stipulation plaintiffs' narrative statement identifies a scheme to acquire plaintiff's properties by "false, fraudulent and coercive means...." Pretrial Stipulation (Docket # 302) at 4.

Racketeering activity is defined at 18 U.S.C. § 1961(1), and is limited to indictable violations of the federal criminal code. Such violations are usually referred to as predicate acts in a civil RICO context. The complaints in these cases alleged violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, as the relevant predicate acts. See Amended Complaint of Plaintiff Loughman (83–921), ¶¶ 64–65, Amended Complaint of Plaintiffs Headlee (83–1679) ¶¶ 73–74, Amended Complaint of Plaintiffs Hughes (83–1678) ¶¶ 71–72, Amended Complaint of Plaintiffs Kent (83–1675) ¶¶ 71–72, Amended Complaint of Plaintiffs Morris and Levine (83–1677) ¶¶ 74–75, Amended Complaint of Plaintiffs McIntyre (83–1676) ¶¶ 78–79, Amended Complaint of Plaintiff Estate of John Throckmorton (83–1754) ¶¶ 72–73, Amended Complaint of Plaintiffs Yesenosky (83–1674) ¶¶ 72–73.

The mail fraud statute provides criminal penalties for devising "any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. The essential elements necessary to establish a violation of Section 1341 are:

1. A scheme or artifice to defraud or to obtain money by false or fraudulent pretenses, representations, or promises;

---

1. This cautionary language echoes the court's opinion in *Swistock* that

    the length of time over which the predicate acts are alleged to have occurred is relevant, but the fact that the alleged predicates occurred over a short period is not dispositive.... Even a closed-ended scheme of short duration, however, could involve a 'distinct threat of long-term racketeering activity, either implicit or explicit.'

    884 F.2d at 757.

2. knowing and willful participation in the scheme or artifice by the defendant, with knowledge of its fraudulent nature and with specific intent to defraud; and

3. the use of the mails in furtherance of the fraudulent scheme.

*United States v. Maze*, 414 U.S. 395, 398–99, 94 S.Ct. 645, 647–48, 38 L.Ed.2d 603 (1974). Similarly, the wire fraud statute proscribes use of the wires with intent to defraud. See 18 U.S.C. § 1343. To bring a private action under Section 1964(c) of RICO, a plaintiff need not show that the defendant has already been convicted of a predicate act, but plaintiff must make a showing that defendant has committed an indictable act. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 481–82, 105 S.Ct. 3275, 3277–78, 87 L.Ed.2d 346 (1985).

■ With our focus on the scheme alleged in the pretrial papers, we will first address plaintiffs' argument that the jury could have reasonably concluded that a scheme to defraud the plaintiffs arose in or about 1978 on the basis of a letter written by defendant Ewing Pollock to Consolidated Coal Company on October 24, 1978, and admitted into evidence as Plaintiffs' Exhibit 220. Plaintiffs make much of Pollock's recommendation in the 1978 letter that "someone should approach these property owners with a figure they can't refuse." Plaintiffs contend that statement is "language right out of the *Godfather.*" Plaintiff's Brief at 6.[2]

The Pollock letter was introduced and admitted at trial through the testimony of defendant Ewing Pollock. In his testimony, Mr. Pollock testified that he generated letters in 1978 and 1979 in connection with the Nineveh Reserves project, which project Pollock testified was different from the 1981 Manor reserves project at the heart of these lawsuits. (Tr. 892–93, 2199, 2204). Further, there was testimony by Mr. Cecil, executive vice president of Consolidated Coal Company, that the Manor

reserves were acquired in 1980, two years after Pollock wrote the letter in question. (Tr. 1511). The closing for the acquisition of the Manor reserves was in January, 1981. (Tr.1587). Given the unrefuted testimony that Mr. Pollock's involvement in 1978 had no relationship to the Manor reserves project, we find that the jury could not reasonably have considered the 1978 letter an indictable predicate act.

To show that they presented evidence sufficient to support a finding that the property acquisition scheme in this case either extended over a substantial period of time or else posed a threat of continued criminal conduct, plaintiffs first point to examples of "alleged threats of long-term repetitive future harm".

For instance, plaintiffs cite testimony given by plaintiff Larry Levine that defendant Boggs threatened that the railroad would use its vast financial and legal resources to crush the Levine family business if they refused to sell their land. (Tr. at 451). Levine's testimony is that this statement was made in late August or early September of 1981. (Tr. at 450). On its face, there is no indication that this statement contained any temporal reference from which the jury reasonably could have inferred longterm conduct nor do we find evidence that it constitutes a predicate act of mail or wire fraud. Likewise, testimony of plaintiff Mark Headlee that defendant Boggs represented that the railroad could place the tracks within ten feet of the Headlee home without taking precautions for the Headlee children's safety, (Tr. at 27), refers to a statement made in a face-to-face meeting sometime between early Fall 1981 and February 1982. (Tr. at 19–20, 24, 53–53). As a matter of law, it does not constitute a predicate act of mail or wire fraud. Also, the statement does not contain a promise or implication of future mail or wire fraud.

---

**2.** If plaintiffs' counsel insist on indulging in this kind of rhetorical extravagance, we will at least require a measure of accuracy in this cinematic allusion. The line from the movie involved an *offer* that could not be refused, a term that connotes a wide range of persuasive and presumably coercive incentives. A *figure* connotes a dollar amount, something we find innocuous and infinitely less threatening in this context.

We find similar deficiencies with testimony concerning statements by plaintiffs Kent and Yesenosky (Tr. 246, 492, 528–29): none of these activities pose a threat of future predicate acts of mail or wire fraud. In citing them, we believe plaintiffs have misconstrued the nature of the threat required by RICO. Preventing longterm criminal conduct is the target of RICO, and not the longterm consequences of each isolated predicate act. The Court in *H.J. Inc.*, held that what must be continuous are the RICO predicate acts or offenses, and gave no such significance to the effects of the overall scheme. 109 S.Ct. at 2902. See also *Swistock v. Jones*, 884 F.2d at 757.

Plaintiffs compare the evidence in these cases to the example given by the Supreme Court in *H.J. Inc.* concerning threatened future criminal activity. In the Court's example, a hoodlum sells window "insurance" to storekeepers, telling them he will return monthly to collect the "premium." 109 S.Ct. at 2902. The difference between the pattern of activity in the Supreme Court's window insurance example and that shown in the instant case illustrates the irrelevance of the evidence highlighted to the Court in plaintiffs' submission. In the hypothetical, the defendant engages in a continuing scheme of fraud with both an illegal means and goal. The continuing nature of his conduct is express; he conveys to his victim that he will return the following month to "collect." We find no evidence in the record that defendants approached these plaintiffs or other individuals to propose other potential transactions. To the contrary, the plaintiffs testified that defendants had not contacted plaintiffs after obtaining the rights of way needed for the Manor Reserve project. (Tr. at 40, 252, 472).

In its discussion, the Court in *H.J. Inc.*, gave an alternate example of cognizable threatened continuity as the case where "predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.* at 2902. Defendants' goal of developing the Manor Reserves in the instant case cannot fairly be equated with the obviously illegitimate goal of the window insurance salesman. No evidence was produced to show defendants' goal was illegal. Rather, the evidence introduced addressed the means used by defendants to acquire plaintiffs' property. The longterm project, *i.e.*, developing the coal reserve, was never questioned. Plaintiffs argue that the magnitude of the project itself posed a societal threat and impact. For instance, the partnership agreement called for development of two coal reserves and five mines. Contrary to plaintiffs' argument, however, the jury was not presented any evidence that any additional right of way would be required by the defendants after the spur in question was completed. Rather, Mr. Cecil, executive vice president of Consolidated Coal Company, testified to the nature of the overall project of developing the Manor reserves, and that the project included building the railroad spur from the cleaning plant at the mine to connect, eventually, to Baltimore. (Tr. at 1518–19). Plaintiffs suggest that the jury could infer from this evidence that defendants posed a threat of future criminal activity. No reasonable person could find in this evidence an implicit threat of future criminal conduct.

Our review of the record reveals that the evidence at trial showed, at the longest, a course of conduct of approximately one year, from June 1981 to June 1982. The unrefuted testimony of defendants and the exhibits introduced therein established that the coal company defendants and the railroad first met to consider a joint land acquisition project in June, 1981. (Tr. 1087, 1345). Defendant Upshur Agency was retained in July 1981 to commence the project. (Tr. at 985–86, 993). The plaintiffs testified to contact with various land agents commencing in or about September, 1981 and ending in June, 1982. (Tr. 19–24, 52–53) (Headlee); 159–60, 179 (McIntyre); 292 (Yesenosky); 328–29, 354 (Hughes); 394, 397 (Levine); 490 (Kent); 568 (Loughman); 661–75 (Attorney Floyd concerning Throckmorton). Testimony of nonplaintiffs whose property was acquired after June, 1982, established that their sales to defendants were arms length transactions con-

ducted with assistance of legal counsel and not allegedly fraudulent or coerced. (Tr. 789–807, 765). We find that the only evidence of predicate mail and wire fraud acts was evidence of acts occurring between June, 1981 and June, 1982. The only evidence of the use of the mails falling outside this time period were the Pollock letters of 1978–80, which we have previously discussed, and letters sent by the coal company to Conrail in January, 1981, which had no connection to any alleged scheme to defraud. The phone calls which were identified as made in connection with the acquisition of plaintiffs' property occurred within the June 1981 through June 1982 period. (Tr. 131, 177–78, 249, 332, 362, 1810).

This reading of the evidence is consistent with Judge Teitelbaum's overview of the evidence presented:

> The evidence presented by plaintiffs at most showed only that the so-called "scheme" of the defendants had but a single, discrete objective—namely, to purchase the right-of-way needed to build a rail line. Such a scheme was not open-ended. It had a discrete temporal endingpoint. *The scheme was completed and came to an end once the necessary properties were acquired.* The scheme also was self-limiting in its scope. It involved only a discrete number of properties necessary to complete the right-of-way. Such self-imposed limitations were inherent to the scheme as depicted by plaintiffs.

Memorandum Opinion, October 22, 1987 (Docket # 391) at 9 (emphasis added).

Our review of *H.J.Inc.* and its progeny brings us to the conclusion that twelve months of the described activity by an association of businesses with a discrete objective does not pose the societal threat of continuing criminal activity required by RICO. *H.J.Inc.,* 109 S.Ct. at 2902 (Congress concerned with longterm criminal conduct in passing RICO). See also *Marshall–Silver Construction Co., supra,* at 597 ("Virtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are 'related' by purpose and are spread over a period of at least several months."); *Menasco v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989) (one year of acts by one perpetrator toward two victims does not pose a special threat to social well-being). The post-*H.J.Inc.* cases which have recognized a continuity of criminal activity or threat for RICO purposes have involved activity lasting at least twice as long as the acts in this case lasted. *Swistock,* 884 F.2d at 759 (activity lasting more than two years); *Shearin,* 885 F.2d at 1166 (alleged racketeering lasted at least two years); *Walk v. Baltimore & Ohio Railroad,* 890 F.2d 688 (4th Cir.1989) (ten years of racketeering is a substantial period); *Newmyer v. Philatelic Leasing, Ltd.,* 888 F.2d 385, 396 (6th Cir.) (five year scheme to defraud hundreds of taxpayers is cognizable RICO pattern), reh'g denied (1989); *Morley v. Cohen,* 888 F.2d 1006, 1010 (4th Cir.1989) (allegations of racketeering activities from 1976 to 1981 are sufficient to meet continuity requirement); *MDO Development Corp v. Kelly,* 726 F.Supp. 79 (S.D.N.Y.1989) (acts of depositing 91 Checks with forged payees and endorsements over 2–3 year period violated RICO).

■ Finally, plaintiffs argue that by establishing evidence of the presence of other schemes, they presented to the jury evidence which could establish a threat of continuing criminal conduct. Specifically, plaintiffs refer to two collateral fraudulent schemes: defendants' nonpayment of real estate transfer taxes and defendants' misrepresentations to plaintiffs concerning the federal government's treatment of these property sales for purposes of personal income taxes. We do not see these acts as separate schemes to defraud in light of the evidence that at least the second "collateral scheme" was presented as an element of the overall scheme to defraud plaintiffs. Moreover, proof of multiple schemes alone will not establish a RICO violation without continuity or a threat thereof. *H.J. Inc.,* 109 S.Ct. at 2901. In light of our holding that no evidence of continuity was presented to the jury, the existence of other schemes is irrelevant.

Defendants' Motion for JNOV is· granted.

## ON POST–TRIAL MOTIONS

This court conducted a new trial in these consolidated cases, on damages only, in March, 1990. The parties have filed various post-trial motions, which we address here *seriatim.* As a preliminary matter, however, plaintiffs have moved to strike defendants' post-trial motions as exceeding the scope of the retrial or for having been waived by defendants. We have addressed only motions relevant to the second trial. In that regard, we find that defendants adequately have preserved these points at trial, with one exception noted below. The motion to strike is denied.

## I. *Defendants' Motions For JNOV and New Trial*

Defendants Consol Pennsylvania Coal Company, Consolidation Coal Company, Consol Land Development Company, The Monongahela Railway Company, Rheinbraun U.S. Corporation, Rheinische Braunkohlenwerke A.G., and Marie Theresa Bergbaugesellschaft MHB (the "Coal Company defendants") move for a judgment notwithstanding the verdict on grounds that plaintiffs introduced insufficient evidence at trial to support a finding of any damages, compensatory or punitive. .The standard for evaluating a judgment notwithstanding the verdict is whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict. *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 259 (3d Cir.1987) *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). Where the evidence is contradictory, a judgment notwithstanding the verdict is in-

appropriate. *Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 752 F.2d 802 (3d Cir.1984), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986).[1]

In these cases, plaintiffs presented expert testimony concerning the fair market value of· their properties which would support the jury's verdict. Therefore, we deny the motion for JNOV.

■ The Coal Company defendants also seek a new trial on several grounds. First, defendants claim that. the amount of damages set by the jury is so excessive as to warrant a remittitur or, in the alternative, a new trial. An order directing plaintiffs to remit a portion of the verdict in excess of the maximum amount supportable by the evidence or, if remittitur is refused, to submit to a new trial is the proper procedure in situations where no clear judicial error or "pernicious influence" can be identified but where the verdict is so large as to shock the conscience of the court. *Kazan v. Wolinski*, 721 F.2d 911, 914 (3d Cir.1983). In light of the evidence presented at trial, we cannot say the size of the verdict here is shocking.

■ Next, defendants allege that certain evidentiary errors by this court necessitate a new trial. In particular, defendants attack the court's decision to admit into evidence the testimony of plaintiffs' real estate experts and the testimony of David Hook, an attorney involved in negotiations with defendants on behalf of some other property sellers, not plaintiffs. We already have addressed the admissibility of plaintiffs' experts' testimony by denying defendants' motions in limine. See *Loughman v. Consol. Pa. Coal Co., et al.,* No. 83–921, slip op. at 7–9 (W.D.Pa. January 31, 1990). We reiterate only that the Federal Rules of

---

**1.** The Third Circuit has explained the JNOV standard as follows:

[S]ince the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict. The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was

bound to apply to the facts, and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been, then it is his duty to set the verdict aside; otherwise not.

*Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 89 (3d Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960).

Evidence establish a liberal policy of permitting expert testimony. In that defendants did not challenge the qualifications of plaintiffs' experts and had ample opportunity to introduce their own experts on the issue of fair market value, we see no error in our decision to admit the testimony of plaintiffs' experts.

■ Likewise, we see no error in allowing David Hook to testify about certain conduct of defendants which was consistent with or similar to the conduct of defendants vis-a-vis the plaintiffs in this case, such information being relevant to plaintiffs' fraud claims. Testimony by Mr. Hook outside the scope of similar or consistent conduct was merely cumulative in nature and created no prejudice to defendants.

■ Defendants allege that plaintiffs' counsel's closing argument was so inflammatory as to support the need for a new trial. In that regard, defendants allege that counsel made references to evidence not of record, that he made inappropriate references to some of defendants' nationalities, and that he improperly argued the finding of liability by the previous jury. After plaintiffs' counsel's closing and upon objections of defendants, this court delivered a curative instruction to the jury.

A new trial may be ordered where counsel engages in improper conduct having a prejudicial effect on the jury. Whether there is prejudice depends on whether there is a reasonable probability that the jury's verdict was influenced by the conduct in question. *Northeast Women's Center, Inc. v. McMonagle,* 689 F.Supp. 465, 471 (E.D.Pa.1988), *aff'd in relevant part, remanded on other grounds,* 868 F.2d 1342 (3d Cir.1989). In light of the curative instruction delivered to the jury, we find no reasonable probability that the jury was influenced improperly by counsel's comments.

Defendants have challenged the sufficiency of the jury charge, complaining that it lacked an appropriate instruction concerning nominal damages and vicarious liability and alleging that it was generally confusing to the jury. As for the lack of

an instruction on nominal damages, there was never a request concerning such a charge and therefore we find any objection now to its absence to be untimely. Concerning the jury instruction on agency and vicarious liability, the court included sufficiently clear instructions on these legal issues and we find defendants suffered no prejudice on this point. Finally, we detected no confusion generally on the jury's part, nor did counsel complain that the charge was potentially confusing, even though counsel were presented with a copy of the charge well before it was delivered orally to the jury.

■ Finally, defendants have raised two due process arguments in support of their new trial motion. First, they complain that with regard to the claims for punitive damages the retrial improperly bifurcated the liability and amount of damages issues. At the first trial, the jury found by special interrogatory that defendants' conduct was outrageous, and that defendants were liable for punitives. Because a RICO claim remained in the case at that time, Judge Teitelbaum's order vacating the damage amounts did not expressly address punitives, the Court having determined that the treble damage provision of RICO precluded the punitives. At the time of retrial, the RICO claims having been dismissed by our Order of March 1, 1990, we determined that Judge Teitelbaum's Order directing that the first jury's calculation of damages was excessive required a retrial of all damages issues. We see no error in retrying the amount of punitives again, and in particular, we find that no prejudice to defendants resulted since the collective sum of punitives assessed at the second trial represented more than a four million dollar reduction from the amount assessed at the first trial.

■ Defendants' second due process argument is that Pennsylvania law provides insufficient guidance to juries in calculating punitive damage awards. We do not recollect defendants previously raising this objection, either in formal motions or in the conferences concerning the jury instruc-

tions. Although defendants have not expounded on the legal basis for this argument in the form of a memorandum or in the motion itself, we presume that defendants are in effect challenging the Pennsylvania Supreme Court's recent holding that the amount of punitive damages need not bear a reasonable relationship to compensatory damages awarded in a particular case. *Kirkbride v. Lisbon Contractors, Inc.*, 521 Pa. 97, 555 A.2d 800 (1989). *Kirkbride* may have eliminated one standard for evaluating punitive damages; however, we find that juries in Pennsylvania still have sufficient guidelines by which to calculate the amount of punitive damages to be assessed, if any. The relevant factors, set forth in the Restatement of Torts (Second), have been adopted by the Pennsylvania courts and were included in this court's jury instructions in the instant cases: ·

> In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

Restatement (Second) of Torts § 908(2) (1979). Accord *Kirkbride*, 521 Pa. at 100, 555 A.2d at 802; *Chuy v. Phil. Eagles Football Club*, 595 F.2d 1265, 1277 (3d Cir.1979). Where the amount of punitive damages is so disproportionate in light of these factors that it shocks the court's sense of justice, the court may, in its discretion, remit the damages to a more reasonable amount. *Kirkbride*, 521 Pa. at 104, 555 A.2d at 803–04.

In light of the circumstances in the trial of these cases, we find that defendants' due process rights were adequately protected.

For the foregoing reasons, the post-trial motions filed by the Coal Company defendants are denied.

Defendants Ewing Pollock, Pollock Pollock & Thomas, the Upshur Agency, Inc., David Boggs, Mike Wilson and William Reese have also filed post-trial motions for judgment notwithstanding the verdict and for a new trial. These motions present us with nothing substantially different from the arguments made by the coal company defendants; therefore, we also will deny the other defendants' motions for JNOV and for a new trial.

## II. *Plaintiffs' Motion to Impose Prejudgment Interest and To Impose Delay Damages*

Plaintiffs have requested both statutory delay damages and common law prejudgment interest. The result of granting both kinds of interest would be duplication of damages, which Pennsylvania law prohibits. *Dean Witter Reynolds, Inc. v. Genteel,* 346 Pa.Super. 336, 499 A.2d 637 (1985), *allocatur denied,* 514 Pa. 635, 522 A.2d 1105 (1987) and 514 Pa. 639, 523 A.2d 346 (1987); *American Enka Co. v. Wicaco Mach. Corp.,* 686 F.2d 1050, 1057 (3d Cir. 1982). Whether plaintiffs are entitled to one or the other type of interest is discussed below.

### A. Delay Damages

■ Plaintiffs seek delay damages under Rule 238 of the Pennsylvania Rules of Civil Procedure. Contrary to plaintiffs' interpretation of the record, this Court has not ruled on this issue previously. In addressing the post-trial motions from the first trial, Judge Teitelbaum held that delay damages were appropriate. *Loughman v. Consol Pa. Coal Co., et al.,* No. 83–921 slip op. at 4 (W.D.Pa. October 22, 1987). Our analysis of the case law leads us to the opposite conclusion and we will deny plaintiffs' motion for delay damages.

Rule 238 provides for mandatory interest on compensatory damage awards arising from bodily injury, death or property damage, which interest is to be calculated from the date of the complaint. Plaintiffs' damages do not arise from bodily injury, death or property damage. These cases do not present the kind of damage to tangible property anticipated by Rule 238. They arise from fraud in the making of contracts. We find them to be tort cases and similar to an action for tortious interference with a contract in that they allege lost profits from the sale of property. Rule 238 does *not* apply to cases involving lost prof-

its or income. *Butler v. Flo–Ron Vending Co.*, 383 Pa.Super. 633, 655, 557 A.2d 730, 741 (1989), *allocatur denied*, 523 Pa. 646, 567 A.2d 650 (1989); *Temporaries Inc. v. Krane*, 325 Pa.Super. 103, 115, 472 A.2d 668, 674 (1984); *Contractor Utility Sales Cos. v. Certain–Teed Corp.*, 748 F.2d 1151, 1157 (7th Cir.1984) (applying Pennsylvania law) (Dumbauld, J.), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985). Plaintiffs' motion for delay damages is denied.

### B. Prejudgment Interest

Plaintiffs also seek common law prejudgment interest.

Common law pre-judgment interest is based on the principle of compensation and the understanding that a plaintiff wrongfully deprived of a sum of money is not made whole unless the delay in recovery is accounted for.

\*     \*     \*     \*     \*     \*

... in Pennsylvania common law damages for delay are recoverable in tort actions when the amount is liquidated or capable of mathematical ascertainment.

*American Enka Co. v. Wicaco Mach. Corp.*, 686 F.2d at 1056, 1057. Prejudgment interest could be appropriate in these cases because the amount of plaintiffs' damage was ascertainable by reference to the fair market value of the properties sold.

The decision to award damages in delay and the rate of interest is in the discretion of the trial court. *Sack v. Feinman*, 495 Pa. 100, 432 A.2d 971 (1981); *Ambromovage v. United Mine Workers of America*, 726 F.2d 972, 981 (3d Cir.1984). Accord *Levy v. First Pennsylvania Bank, N.A.*, 338 Pa.Super. 73, 84, 487 A.2d 857, 863 (1985).[2] There are four factors to consider when contemplating an award of prejudgment interest:

1)  whether the claimant has been less than diligent in prosecuting the action;

2)  whether the defendant has been unjustly enriched;

3)  whether an award would be compensatory; and

4)  whether countervailing equitable considerations militate against such a surcharge.

*American Mut. Liability Ins. Co. v. Kosan*, 635 F.Supp. 341, 346 (W.D.Pa.1986) (Weber, J.), *aff'd w/o op.*, 817 F.2d 751 (3d Cir.1987); *Pension Benefit Guaranty Corp. v. Greene*, 570 F.Supp. 1483, 1503 (W.D.Pa.1983), *aff'd w/o op.*, 727 F.2d 1100 (3d Cir.), *cert. denied*, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984).

Plaintiffs have been diligent in pressing their claims, having filed them within a year of the last land transaction in question. Given both juries' determinations concerning liability and damages, the second and third factors favor a grant of prejudgment interest.

With respect to the fourth factor, defendants have raised the issue of waiver by contending that plaintiffs did not seek common law prejudgment interest prior to the post-trial motion stage of this litigation. Our review of the record indicates that plaintiffs did not seek common law prejudgment interest in their complaints (including original and amended complaints), in their pretrial calculations of damages or even in their post-trial motions filed after the first trial in 1985.[3]

■■■■ Having failed to preserve this issue during seven years of litigation, we find that plaintiffs' request for prejudgment interest at this juncture is untimely. *Arkla Exploration Co. v. Boren*, 411 F.2d 879, 883–84 (8th Cir.1969) (no entitlement to prejudgment interest where plaintiff did not preserve issue). The equities clearly militate against granting interest, and plaintiffs' motion for common law prejudgment interest is denied.

---

**2.** Contrary to defendants' position that only the jury can grant prejudgment interest, we are satisfied that the trial court may mold the verdict to include it. *Verner v. Shaffer*, 347 Pa.Super. 206, 211, 500 A.2d 479, 482 (1985).

**3.** Plaintiffs sought Rule 238 delay damages after the first trial, which request was originally denied but then was granted upon reconsideration.

For the foregoing reasons, all post-trial motions filed by defendants and plaintiffs are denied.