Julia DORSETT

v.

**AMERICAN ISUZU MOTORS, INC. and Isuzu Motors, Ltd.**

Civ. A. No. 89–9111.

United States District Court, E.D. Pennsylvania.

Feb. 3, 1992.

---

John J. Mahoney, Thomas R. Wilson, [COR LD NTC], Crawford, Wilson, Ryan & Agulnick, P.C., West Chester, Pa., for plaintiff.

Raymond T. Le Bon, Joseph V. Pinto, William J. Conroy, Jeanne M. Proko, White and Williams, Philadelphia, Pa., for defendants.

## OPINION

CAHN, District Judge.

### I. *Background*

On December 22, 1987, Julia Dorsett was driving her stepfather's 1987 Isuzu Trooper II ["the Trooper"] home from a friend's Christmas party. While she was driving north on Route 202, traveling at sixty to sixty-five miles per hour in the right lane

of the two lane highway, she came upon a slow moving vehicle. That vehicle, driven by Paul Allen Benner–Smith, was proceeding at approximately forty to fifty miles per hour because of engine trouble. In order to avoid colliding with Benner–Smith's car, Julia quickly steered to the left. As she did so, her car left the road and entered the median strip. As she steered back to the right in order to regain the road she lost control of her car. The car rolled over several times, coming to rest on the passenger's side. As a result of this accident, Julia sustained a convoluted fracture of her T–12 and L–1 vertebrae. The resulting damage to her spinal cord has rendered her a paraplegic.[1]

Julia filed suit against American Isuzu Motors, Inc. and Isuzu Motors, Ltd.,[2] alleging that the Isuzu Trooper II in which she was driving was defectively designed. This case was tried to a jury from September 4, 1991 until September 24, 1991.[3] In its answers to interrogatories the jury found that 1) the plaintiff had proven, by a preponderance of the evidence, that the Isuzu Trooper II was defectively designed, and that there was an alternative, safer design; and 2) that the plaintiff had proven, by a preponderance of the evidence, that the defect had been a substantial factor in causing injuries to Julia over and

above the injuries which she would have sustained had the safer design been used. The jury then awarded damages in the amount of $148,755.42 for medical expenses to date, $3,232,334.00 for future medical and care expenses (reduced to present value), $336,000.00 for loss of future earning capacity, and $5,000,000.00 for pain, suffering, humiliation, embarrassment and loss of life's pleasures (for a total of $8,717,089.42). *See* App. IV p. 216 l. 11—p. 217 l. 24.[4]

Now before the court are the defendant's Motions for Judgment Notwithstanding the Verdict ["JNOV"] or, in the alternative, for a New Trial.[5] The court heard oral argument on these Motions on January 3, 1992. For the reasons set forth below, the Motions will be denied.

## II. *Standards*

### A. Standards for Granting JNOV

■ A court cannot grant a JNOV motion unless the party seeking the JNOV moved for a directed verdict at the close of all the evidence at trial. *See Keith v. Truck Stops Corp. of America*, 909 F.2d 743, 744 (3d Cir.1990); *Mallick v. International Brotherhood of Electrical Workers*, 644 F.2d 228, 233 (3d Cir.1981); Fed. R.Civ.P. 50(b).

---

1. Kathleen Herbison, a passenger in Julia's car, suffered spinal injuries at C–3/C–4 and T–12/L–1. She was not paralyzed, however. Kathleen is not a party to this lawsuit.

2. Since American Isuzu Motors, Inc. and Isuzu Motors, Ltd. elected to employ a single attorney at trial they will be referred to collectively as "the defendant" for the remainder of this Opinion.

3. In addition to recessing for the weekends of September 7–8 and 21–22, the trial was recessed from September 11 through September 16 so that the court could attend the Third Circuit Judicial Conference. The trial was also in recess on September 23 so that the court could attend to matters in certain criminal cases. These recesses gave counsel ample time to prepare to meet any unexpected challenges presented by the trial. *See* App. I p. 293 l. 3–6.

4. Citations to the record are in the form App. __ p. __ l. __. Citations are to the dark page numbers printed in the lower right corner of the

page (rather than to the light page numbers printed in the upper right corner of the page).

5. The defendant's Motion for Remitter was withdrawn by a letter to the court on December 12, 1991. The plaintiff's Motion for Additur was likewise withdrawn by a letter to the court on January 3, 1992. The court is heartened by the parties decisions to withdraw these Motions. *See Fleck v. KDI Sylvan Pools, Inc.*, No. 89–1348, Slip op. at 3, 1991 WL 261659 (E.D.Pa. December 6, 1991) (stating that, in a case involving a plaintiff who was rendered a quadriplegic after diving into a shallow pool, "neither the ten million dollars, the amount of the verdict, nor any other dollar amount will ever compensate the plaintiff for the physical condition which he must live with the rest of his life. Defendant's argument for remittitur surely must have been included in its post trial motion merely as a matter of form, not substance."); *Ansbro v. National Railroad Passenger Corp.*, No. 90–5042, Slip op. at 1, 1991 WL 258831 (E.D.Pa. December 3, 1991) ("the concept of additur is not cognizable in the federal courts.").

The specific grounds for a JNOV must be asserted in the motion for a directed verdict. If the issue was not raised in the motion for the directed verdict at the close of *all* the evidence, it is improper to grant the JNOV on that issue. The requirement that the specific issue be raised first in the motion for a directed verdict, before the issue is submitted to the jury, affords the non-moving party an opportunity to reopen its case and present additional evidence. Further, when a trial court decides an issue after it was properly submitted to the jury, it may deprive the non-moving party of [its] seventh amendment rights.

*Bonjorno v. Kaiser Aluminum and Chemical Corp.*, 752 F.2d 802, 814 (3d Cir. 1984), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986) (emphasis supplied) (citations omitted). Since the defendant did so, *see* App. IV p. 97 l. 22–25, the court must now consider the JNOV Motion on the merits.

In deciding whether a JNOV motion should be granted, "[a] court must view the evidence in the light most favorable to the non-moving party, and determine whether 'the record contains the "minimum quantum of evidence from which a jury might reasonably afford relief." ' " *Keith*, 909 F.2d at 745 (citation omitted). *See also Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir.1990); *Bhaya v. Westinghouse Electric Corp.*, 832 F.2d 258, 259 (3d Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989); *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 113 (3d Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987); *Grace v. Mauser–Werke GMBH*, 700 F.Supp. 1383, 1387 (E.D.Pa.1988). It is for this reason that "[n]ormally, when the evidence is contradictory, a JNOV is inappropriate." *Bonjorno*, 752 F.2d at 811 (citation omitted). The jury must weigh the evidence, if the evidence is in dispute, because "[e]valuation of witness credibility is the exclusive function of the jury." *Bhaya*, 832 F.2d at 262. *See also Bonjorno*, 752 F.2d at 811; *Grace*, 700 F.Supp. at 1387. It is only where "there can be but one reasonable conclusion as to the proper judgment" that a JNOV can be granted. *See Loughman v. Counsol–Pennsylvania Coal Co.*, 740 F.Supp. 1114, 1116 (W.D.Pa. 1990) (citations omitted).

## B. Standards for Granting a New Trial

"In general, the ordering of a new trial is committed to the sound discretion of the district court." *Bonjorno*, 752 F.2d at 812. *See also Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir.1991); *Honeywell v. American Standards Testing Bureau, Inc.*, 851 F.2d 652, 655 (3d Cir.1988), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 787 (1989); *Feingold v. Raymark Industries, Inc.*, 1988 Westlaw 76114 at *3 (E.D.Pa. July 19, 1988); *Grace*, 700 F.Supp. at 1387. A new trial cannot be granted, however, merely because the court would have weighed the evidence differently and reached a different conclusion. *See Feingold*, 1988 Westlaw 76114 at *3; *Grace*, 700 F.Supp. at 1387. A court can only exercise its discretion to grant a new trial because the verdict was against the weight of the evidence when the failure to do so would result in injustice, or would shock the conscience of the court. *See Williamson*, 926 F.2d at 1352–53; *Step–Saver Data Systems, Inc. v. Wyse Technology*, 752 F.Supp. 181, 185 (E.D.Pa.1990), *aff'd in relevant part*, 939 F.2d 91 (3d Cir.1991); *Feingold*, 1988 Westlaw 76114 at *3; *Grace*, 700 F.Supp. at 1388.

## III. *The Defendant's Arguments*

The defendant has advanced a veritable plethora of arguments in support of its Motions. Since many of these arguments apply to both Motions, the court will not distinguish between the arguments advanced to justify the entry of JNOV or the grant of a New Trial. Suffice it to say that, since the court is convinced that the trial was fair and a new trial is not warranted, the entry of JNOV would be inappropriate.

Before discussing the defendant's arguments, the court is obliged to point out that, while all parties are entitled to a fair trial, they are not entitled to a perfect trial.

*See McQueeney v. Wilmington Trust Co.,* 779 F.2d 916, 927 (3d Cir.1985) (Becker, J.); *Marks v. Mobile Oil Corp.,* 562 F.Supp. 759, 769 (E.D.Pa.1983), *aff'd,* 727 F.2d 1100 (3d Cir.1984). It is for this reason that Fed.R.Civ.P. 61 provides that

> [n]o error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding *must* disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Civ.P. 61 (emphasis supplied). *See also McQueeney,* 779 F.2d at 923. A trial court's determination that, in the context of a given trial, an error was harmless is accorded substantial deference. *See Marks,* 562 F.Supp. at 769.[6] The longer the trial, the less likely a given error will have tainted the trial as a whole. *See Marks,* 562 F.Supp. at 769 (the proffered error "constitutes at most a slight defect in the three-week trial of this action."). In a lengthy, factually complex case such as this one, it is much more likely that it is "highly probable" that any given error did not affect the outcome of the case. *See McQueeney,* 779 F.2d at 917. For this reason, many of the rulings the defendant takes issue with would be harmless, if they were indeed erroneous. Finally, the fact that the court may have neglected to mention an argument advanced in one of the briefs is not to imply that the court has ignored it; rather it is to imply that some of the arguments advanced by the parties do not merit a response in this Opinion.[7]

**A. The Plaintiff's Use of Negligence Concepts at Trial**

The defendant argues that the plaintiff impermissibly introduced negligence concepts into this strict liability trial. Specifically, the defendant objects to the plaintiff's references to Isuzu's knowledge of the Trooper's propensity to roll, *see* Def. New Trial Mem. at 24–25, and to the plaintiff's references to Isuzu's knowledge of alternative seatbelt designs. *See* Def. New Trial Mem. at 27. Although these references may have included terms often seen in negligence cases, they were proper in the context of this particular strict liability case.

■ The Pennsylvania courts[8] have "embraced" Section 402A. *See Azzarello v. Black Bros. Co.,* 480 Pa. 547, 391 A.2d 1020, 1023 (1978); *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853, 854 (1966). In doing so, the Pennsylvania courts have made it clear that it is error to allow the introduction of negligence concepts in a 402A case. *See Azzarello,* 391 A.2d at 1027; *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893, 889 (1975) ("What the [party] is not permitted to do directly, we will not allow him to do indirectly by injecting negligence concepts into strict liability theory."). The court finds, however, that, rather than having introduced negligence concepts into the case, the plaintiff simply met its burden of establishing a lack of crashworthiness in the Isuzu Trooper II. Any resemblance this proof may have had to proof of negligence was purely coincidental, and necessitated by the specific facts of this case. Indeed, it is often the case that the plaintiff's proof in a 402A case "rings

---

**6.** The standard for determining when error is harmless is the same in civil and criminal trials. *See McQueeney,* 779 F.2d at 924. "[A] court can find that such errors are harmless only if it is highly probable that the errors did not affect the outcome of the case." *McQueeney,* 779 F.2d at 917.

**7.** The briefs filed by the defendant in support of these Motions exceed 174 pages. The briefs

filed by the plaintiff exceed 106 pages. Finally, the appendices filed by the parties exceed 1845 pages.

**8.** Pennsylvania law is controlling in this diversity case. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 79–80, 58 S.Ct. 817, 823, 82 L.Ed. 1188 (1938).

of negligence." *See Berkebile,* 337 A.2d at 899.[9]

■ The plaintiff in this case alleged, in a nutshell, that the Isuzu Trooper II was not crashworthy. "Crashworthiness is simply a subset of strict liability." *Roe v. Deere and Co., Inc.,* 855 F.2d 151, 154 (3d Cir.1988). In order to prevail on a crashworthiness theory under Section 402A, a plaintiff must prove 1) that there was an alternate, safer design that was practical under the circumstances; 2) the injuries that would have resulted if the alternate, safer, design had been used; and (as a corollary to the second element) 3) the extent of the enhanced injuries attributable to the defective design. *See Habecker v. Clark Equipment Co.,* 942 F.2d 210, 214 (3d Cir.1991) (applying *Huddell*); *Huddell v. Levin,* 537 F.2d 726, 737–38 (3d Cir. 1976); *see also Roe,* 855 F.2d at 153 n. 2 (*Huddell* is applicable to cases brought under Pennsylvania law).

■ The plaintiff's arguments concerning the propensity of the Isuzu Trooper II to roll, and the defendant's knowledge of this fact, were simply directed towards proving the existence of a defect and thus towards meeting the plaintiff's burden of proof. *See Huddell,* 537 F.2d at 734 ("As a rule the mere occurrence of an accident is not sufficient to establish that the product was not fit for ordinary purposes."); *Berkebile,* 337 A.2d at 898 ("Strict liability requires, in substance, only two elements of requisite proof: the need to prove that the product was defective, and the need to prove that the defect was a proximate cause of the plaintiff's injuries.") (footnote omitted); Restatement (Second) of Torts § 402A comment g. This proof of a defect resembles, on its face, proof of negligence because the plaintiff used a two step argument in order to establish that the Trooper was defective. The plaintiff did not argue that the Trooper is defective because it has a propensity to roll. Rather, the plaintiff argued that, given the Trooper's *known* propensity to roll, the seatbelt was defective because it could not perform adequately under the conditions that were *expected* to obtain. *See* App. I p. 149 l. 4–13 (plaintiff explaining, and defendant acknowledging understanding of, this theory of the case); App. III p. 303 l. 11—p. 304 l. 14 (summarizing the plaintiff's theory).[10]

Since a manufacturer is not liable for damages resulting from the abnormal use of its products, *see* Restatement (Second) of Torts § 402A comment h, the plaintiff was obligated to prove that rollovers in the Isuzu Trooper II were expected. It is only if the enhanced expectancy of rollovers could be proven that the defendant would have a duty to design a seatbelt system which would function safely during such an event. For this reason, the plaintiff's proof regarding the propensity of the Trooper to roll was a necessary part of the plaintiff's prima facie 402A case.

■ Similarly, the plaintiff's comments regarding the defendant's knowledge of alternative seatbelt designs were integral parts of the plaintiff's case under *Huddell.*

---

**9.** Because of the fine line under Pennsylvania law between permissible and impermissible proof in a 402A case the court took care to warn the plaintiff when its argument started to sound too much like a negligence case. *See* App. IV p. 166 l. 4–7.

**10.** The plaintiff was obliged to make such a two step argument. In other cases, manufacturers of utility vehicles have successfully argued that, since a utility vehicle must have a narrow track width and a high center of gravity in order to be operated off the road, a utility vehicle which has a high rollover propensity is not defective. *See* App. I p. 89 l. 2–11.

This argument advanced by the manufacturers of utility vehicles resembles an adage familiar to every first year law student—a knife is not defective simply because it is sharp. *See Berke-*

*bile,* 337 A.2d at 899 (discussing sharp knives); Restatement (second) of Torts § 402A comment i (discussing sugar, whisky, tobacco and butter). The plaintiff's theory of the case resembles the following argument: given a sharp knife, the manufacturer has an obligation to design the handle in such a way as to prevent the user's hand from slipping onto the blade. The knife is not defective because of the blade, but because of the handle. Absent such a sharp blade, the manufacture would not have to supply such a good handle. *Cf.* App. I p. 282 l. 10–13 ("The theory is . . . that the product is unsafe because it's more prone to fatal rollovers than other vehicles, and therefore you should take special case [sic] with the restraint system, that is the theory.").

The plaintiff had to contend with the possibility that the defendant would deny the existence of an alternative, safer seatbelt design. If the defendant did so, and if the jury agreed, the defendant would prevail. *See Huddell,* 537 F.2d at 737. Showing that the defendant knew of the alternative seatbelt designs was therefore simply a way of proving that alternative designs existed.[11] This was explained to the defendant at trial. *See* App. I p. 45 l. 8–10. *See also* App. I. p. 67 l. 19—p. 69 l. 2. For these reasons, the court finds that negligence concepts were not improperly introduced at trial.

### B. "Arrogance"

■ The defendant claims that the plaintiff's use of the word "arrogance"[12] thirteen times during rebuttal argument was prejudicial and warrants the granting of a new trial.[13] *See* Def. New Trial Mem. at 22–23. The court disagrees. All attorneys have an ethical duty to zealously advocate their client's cause. A court can "not expect advocacy to be devoid of passion." *Draper v. Airco, Inc.,* 580 F.2d 91, 95 (3d Cir.1978) (Higginbotham, J.). Notwithstanding the sometimes passionate nature of zealous advocacy, a court must place "restraints against blatant appeals to bias and prejudice." *Draper,* 580 F.2d at 95.

A trial court has discretion to determine where the line between zealous advocacy and an appeal to prejudice lies. *See Kloepfer v. Honda Motor Co., Ltd.,* 898 F.2d 1452, 1461 (10th Cir.1990); *Matthews v. CTI Container Transport International, Inc.,* 871 F.2d 270, 278 (2d Cir.1989); *Drap-*

er, 580 F.2d at 94; *Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357, 389 (E.D.Pa.1982) (Bechtle, J.), *aff'd,* 760 F.2d 481 (3d Cir.1985). In determining when an attorney's statements have ceased to be advocacy and have begun to appeal to bias and prejudice, trial courts have been instructed to examine the "cumulative thrust of plaintiff's counsel's argument." *Draper,* 580 F.2d at 95. *See also Anastasio v. Schering Corp.,* 838 F.2d 701, 706 (3d Cir. 1988). Trial courts have also been reminded "[n]ot every improper or poorly supported remark made in summation irreparably taints the proceedings...." *Matthews,* 871 F.2d at 278; *see also Interstate Markings v. Mingus Constructors,* 941 F.2d 1010, 1015 (9th Cir.1991).

Looking at the plaintiff's rebuttal argument as a whole, it is clear that the plaintiff's tactical choice to label the defense as "arrogant" was within the bounds of zealous advocacy.[14] Even if the plaintiff's rebuttal had departed from the realm of zealous advocacy, the departure would not have been sufficient to prejudice the defendant. After hearing testimony for three weeks, the court does not believe that the jury was improperly swayed by these thirteen words, even if these words did come at the conclusion of the trial. *Cf. Loughman,* 740 F.Supp. at 1123 (declining to grant a new trial because there was "no reasonable probability that the jury was influenced improperly by counsel's comments.").

Indeed, courts have approved of tactics far more caustic than those chosen by the plaintiff in this case. In a lawsuit for the breach of a performance bond, the Court of

---

**11.** Although this type of proof might not be the best proof of an alternative design available, an attorney is not required to produce the evidence most probative of her position.

**12.** Counsel for the plaintiff specifically stated that he was referring to the arrogance of the defendant, not to the defendant's counsel. *See* App. IV p. 192 l. 4–7.

**13.** The defendant did not make a contemporaneous objection to the plaintiff's use of the word arrogance. *See* App. IV p. 192 l. 4—p. 204 l. 4. Although the failure to make a contemporaneous objection is usually a bar to the assignment of error, there is some caselaw which suggests that a contemporaneous objection is not neces-

sary in this particular context. *See Anastasio v. Schering Corp.,* 838 F.2d 701, 706 n. 11 (3d Cir.1988). For this reason, the court will consider the merits of the defendant's argument.

**14.** Surely the defendant does not contend that any characterization of the opposing party's case is impermissible. Had Julia Dorsett's injuries been limited to "whiplash," the defense might have been sorely tempted to use terms stronger than "arrogance" to describe the case presented by opposing counsel. The court will not prevent attorneys on either side of the courtroom from employing forceful advocacy.

Appeals for the Ninth Circuit refused to overturn a jury verdict because of the plaintiff's use of the phrase "Aetna, we never met ya" during closing argument. *See Interstate Markings*, 941 F.2d at 1015. In a case involving the breach of a contract to deliver oil, the Court of Appeals for the Fifth Circuit held that the plaintiff's references to Colonel Moammar Khadafy during closing argument were harmless error within the meaning of Fed.R.Civ.P. 61. *See Nissho–Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619–20 (5th Cir. 1988). Similarly, this court refuses to reverse a jury verdict because of the plaintiff's use of the word "arrogance."

### C. The Plaintiff's Use of Analogies to Movies and Potholes

■ In its case-in-chief, the defendant argued that Julia's injuries were caused by a "slamdown" (i.e. her injuries were caused by the shock transmitted through her buttocks when the Trooper's wheels hit the ground during the rollover). *See* App. III p. 252 l. 12–18. In closing, the plaintiff suggested that, if what the defendant's experts said was true, people would be constantly injured while shooting stunt movies or while driving over potholes. *See* App. IV p. 178 l. 6—p. 179 l. 3.[15]

The defendant objected to this argument. In response, the court reminded the jury that it was not to consider its personal experiences when deciding the case. *See* App. IV p. 179 l. 10–11. The court also suggested, however, that the plaintiff's analogy was, in part, fair argument. *See* App. IV p. 179 l. 5. In making an analogy to movies and potholes, the plaintiff was appealing to the jury's common sense in an effort to convince the jury to credit the plaintiff's experts over the defendant's experts. Such appeals to common sense are proper. Even if this appeal was, at some level, improper, it cannot be said that is it highly probable that this particular appeal was outcome determinative. *See Matthews*, 871 F.2d at 278; *McQueeney*, 779

F.2d at 917. The court therefore declines to order a new trial on this contention.

### D. Analogies Drawn to Kathleen Herbison's Injuries

■ In closing, the plaintiff also referred to Kathleen Herbison's injuries. *See* App. IV p. 173 l. 8–12. The defendant now argues that allowing this argument was error, since there was no testimony regarding the cause of Kathleen's injuries.

In urging this argument upon the court, the defendant has ignored the existence of testimony that Kathleen and Julia had the same injuries. Dr. Jerome Cotler testified by videotape deposition that "[t]here were two young ladies simultaneously that were admitted to this institution that were involved in some motor vehicular accident, and they both had relatively comparable, at least as far as I was concerned, injuries, and particularly from an orthopedic standpoint, a spine standpoint." App. IV p. 291 l. 21—p. 292 l. 2. He further testified that "what was interesting to us was, her riding mate [Kathleen] had an identical set of injuries at Thoracic 12 and 1 and at Cervical 3–4." App. IV p. 314 l. 8–10. Dr. John Bomalaski also testified that Kathleen's injuries were similar to Julia's. *See* App. I. p. 328 l. 11—p. 330 l. 12.

Cotler also gave his opinion as to why Kathleen had sustained less severe injuries than Julia. *See* App. IV p. 314 l. 14—p. 315 l. 10. It is this testimony which laid the foundation for the plaintiff to ask the jury to infer that Julia and Katherine's injuries had the same cause. Although Cotler never explicitly stated the source of the "energy" which was "equally distributed" in Kathleen, *see* App. IV p. 314 l. 20–21, the jury heard ample testimony that a C–3/C–4 cervical subluxation could only be caused by a "top down" force (i.e. by the head hitting the roof). *See* App. I p. 430 l. 25—p. 431 l. 9; App. I. p. 456 l. 2–12; App. IV p. 58 l. 9–11. *See also* App. IV p. 322 l. 22—p. 324 l. 22 (a head strike is compatible with a C–3/C–4 cervical subluxation).

---

**15.** The plaintiff also attempted to meet the slamdown theory on the merits. *See, e.g.*, App. I p. 446 l. 10—449 l. 3 (Perrone testifying that a slamdown could not have caused Julia's injuries).

Since it was not disputed that Kathleen had suffered a subluxation, the jury could infer that she had come into contact with the roof, and was therefore out of her seatbelt during the rollover.

Finally, even if there was not sufficient evidence of the cause of Kathleen's injuries to merit comment during the plaintiff's closing, the error would be harmless. The reason the plaintiff made the comparison was to show that Kathleen was out of her seatbelt. *See* App. IV. p. 173 l. 12. The plaintiff could just as easily have argued that, since neither Whalen nor Benner–Smith testified that they released Kathleen from her seatbelt, Kathleen must not have been restrained by the seatbelt during the rollover. Since the plaintiff's thrust could have been made by other means, and since it was a minor thrust in the context of a major trial, it is "highly probable" that any error that occurred did not affect the jury's verdict.

### E. The Direction of the Force Which Caused Julia's Injuries

During the trial the defendant argued that, had Julia's head come into contact with the roof of the Trooper during the rollover, she would have sustained head or neck injuries. For this reason, the defendant spent a great deal of time arguing that Julia had not sustained a C–3/C–4 cervical subluxation, *see* App. I p. 344 l. 11—p. 350 l. 25, or bruising to her head. *See* App. I p. 139 l. 22—p. 140 l. 4; App. I p. 350 l. 24—p. 353 l. 10; App. IV p. 74 l. 22–23.

The jury heard testimony, though, from which it could conclude that Julia had sustained a C–3/C–4 cervical subluxation. *See* App. I p. 140 l. 21—p. 141 l. 1; App. I p. 325 l. 14–16; App. I. p. 333 l. 23—p. 334 l. 25; App. IV p. 313 l. 22—p. 314 l. 7; App. IV p. 330 l. 6–12; App. IV p. 354 l. 4–23. The jury also heard testimony that the human skull is capable of sustaining a blow capable of causing Julia's injuries without bruising. *See* App. I p. 463 l. 9–17; App. I p. 525 l. 8–20 ("Would you absolutely expect to find a head injury in order that you would have the injury at T12/L1 and the

subluxation, C3/C4? A: No. The skull can take loads up to 1,000 pounds or more so, depending upon the distribution of the load. And the way that deforming—so the fact that there is no skull fracture is not at all surprising. It's well within what one would expect. The fact that there wasn't an injury manifested in the form of a trauma, I think it's feasible and possible and I think that it was—in my judgment, it doesn't rule out the prospect that the load was applied despite the fact that there was no registering of a complaint, per se."). This testimony presented the jury with a classic credibility determination. It could have chosen to believe either the plaintiff's or the defendant's witnesses. The court is not permitted to second-guess this credibility determination in the context of a Motion for JNOV or a New Trial. *See Bhaya*, 832 F.2d at 262.

■ The jury also could have concluded that Julia's injuries were caused by a glancing, rather than a direct, blow to her head. In closing, the plaintiff invited the jury to draw this conclusion by referring to bruises Julia sustained to her inner ear during the accident. The defendant claims that allowing this argument was error because there was no testimony from which the jury could have concluded that such bruising occurred. In fact, the jury heard testimony that Julia had sustained bruising in the area of her left eye and on the "inside" of her ear, by the tympanic membrane. *See* App. I. p. 325 l. 8–11. From this the jury could infer that Julia had hit her head on the roof of the Trooper, even if no witness was able to identify a specific "head strike mark."

Finally, even if there were no direct evidence of a "head strike" (i.e. if there was no bruising to Julia's head, and if no witness could identify a "head strike mark" on the roof of the Trooper) the jury would still be permitted to infer that a head strike had occurred. *See* App. I. p. 425 l. 2–4; App. IV p. 59 l. 23—p. 60 l. 18. While such an inference would not be mandated, it was within the realm of permissible conclusions the jury could have drawn based on the evidence presented at trial. No miscar-

riage of justice would have resulted if the jury had reached such a conclusion. A new trial is therefore improper.

### F. Identifying the "Head Strike"

At trial the plaintiff expended a great deal of time and energy trying to convince the jury that Julia's head had come into contact with the roof of the Trooper during the rollover. The plaintiff did so because, according to the plaintiff's theory of the case, Julia's head could have only come into contact with the roof if the seatbelt had failed to restrain her. For obvious reasons, the defendant spent even more time and energy attempting to convince the jury that Julia was restrained by her seatbelt during the entire rollover, and that her head never came into contact with the roof of the Trooper. The defendant now claims that errors in the plaintiff's identification of an alleged "head strike mark" on the roof of the Trooper merit a new trial.

Before discussing the admissibility of the plaintiff's evidence of the alleged head strike mark, the court must point out that the identification of a head strike mark was not necessary to the plaintiff's case. The jury could infer that Julia's head came into contact with the roof of the Trooper during the rollover in either of two ways. For this reason, any error involving the identification of the head strike mark would be harmless.

First, the jury could credit Perrone's testimony that a T–12/L–1 fracture cannot be caused by "bottom up" forces. *See* App. I p. 428 l. 22–25. If the jury found that Julia's injuries could not be caused by "bottom up" forces, the jury was free to infer that the injury had to be caused by "top down" forces, i.e. by a blow to the head. If the jury made this inference, it would be logical for the jury to conclude that the

source of the top down force was a blow to Julia's head.[16]

Second, the jury was presented with ample evidence from which it could conclude that Julia had sustained a C–3/C–4 cervical subluxation. *See* App. I p. 140 l. 21—p. 141 l. 1; App. I p. 325 l. 14–16; App. I. p. 333 l. 23—p. 334 l. 25; App. II p. 28 l. 12—p. 29 l. 6; App. IV p. 313 l. 22—p. 314 l. 7; App. IV p. 330 l. 6–12; App. IV p. 354 l. 4–23. The jury could conclude that such an injury could only have been caused by a blow to the head. *See* App. I p. 430 l. 25—p. 431 l. 9; App. I. p. 456 l. 2–12; App. IV p. 58 l. 9–11. *See also* App. IV p. 322 l. 22—p. 324 l. 22 (a head strike is compatible with a C–3/C–4 cervical subluxation).

The jury could have also found direct evidence that Julia's head came into contact with the roof of the Trooper during the rollover. On direct examination Perrone identified a head strike mark on a picture of the Trooper that Julia had been driving on December 22, 1987. *See* App. I p. 432 l. 9–12. *See also* App. I p. 466 l. 3–8 (Perrone circling the head strike mark on Exhibit P–36). The defendant attempted to discredit this testimony during cross-examination. *See* App. I p. 466 l. 10—p. 467 l. 17.

During its case-in-chief, the defendant argued that the mark identified by the plaintiff was caused by a forklift which had been used to move the Trooper after the accident had occurred. *See* App. III p. 36 l. 3—p. 38 l. 21. *See also* App. IV p. 86 l. 11—p. 89 l. 10 (defendant's rebuttal).

Faced with this testimony, the plaintiff backed away from Exhibit P–36. During the plaintiff's rebuttal, Cantor testified that, in his opinion, Julia's head had been struck a "glancing blow" by her left ear. *See* App. IV. p. 56 l. 1–18; App. IV p. 73 l. 17–21. The defendant now objects to this testimony. Since the defendant had ample opportunity to cross-examine Cantor about

---

**16.** The jury also heard testimony that the roof of the Trooper had deformed inward over the driver's side of the passenger compartment. *See* App. I. p. 123 l. 24—p. 124 l. 3. While the plaintiff did not argue a separate "roof crush" theory, *see* App. I. p. 291 l. 2—p. 292 l. 12; App. III p. 302 l. 11–15, the evidence of roof deformation would allow the jury to conclude that Ju-

lia's injuries were caused when her seatbelt allowed her to slip out of her seat by a couple of inches, but otherwise restrained her. Metaphorically speaking, the evidence of roof deformation meant that the plaintiff's case had "less ground" to cover. *See* App. I p. 442 l. 23—p. 443 l. 5.

any changes in his testimony between the plaintiff's case-in-chief and rebuttal, *see* App. IV p. 72 l. 17—p. 74 l. 10, any error which might have resulted would be harmless. The jury was perfectly capable of evaluating the credibility of an expert witness who altered his testimony during the trial. Apparently, the jury felt that Cantor remained credible, and that the alteration of his testimony was minor. The jury was entitled to come to this conclusion. The court is unaware of any case which holds that a new trial is mandated when a witness alters his testimony during the trial and declines to set such a precedent in this case.[17]

### G. The Scope of Perrone's Expert Report vis a vis the Head Strike, the Direction of Force, and the Mechanism of Injury

▮ The defendant claims to have been prejudiced when Perrone circled the alleged head strike mark on Exhibit P–36.[18] The defendant objects both because the "circled" photograph was not produced prior to trial, and because Perrone's expert report did not identify the head strike mark. Similarly, the defendant argues that Perrone's report did not include a description of the mechanism which caused Julia's injury, nor the direction from which the injuring force came. Since the court recognizes that it is not possible to submit a verbatim transcript of an expert's testimony as an expert report, the court has never required that *everything* an expert testifies to be contained in the report. So long as the report is sufficient to put the opposing party on notice as to what the expert would say, the court will allow the expert to say it. *See* App. II p. 291 l. 22—p. 292 l. 15; App. II p. 340 l. 13–17 (ruling that the plaintiff's objection to the representativeness of defense expert's study goes to the weight of the study); App. III p. 209 l. 18–24 (overruling the plaintiff's objection to a defense ex-

pert's testimony); App. III p. 248 l. 21—p. 252 l. 4 ("the record should also show that there's no surprises with this vehicle. The theory in this case has been disclosed, the defense has been disclosed and the nit picking of how you're going to prove it is not what we're talking about, was it, in the pretrial discovery stage?"). The position taken by the court during the trial is amply supported by the caselaw. *See e.g., Marks,* 562 F.Supp. at 766 ("As the preceding discussion had indicated, [defense] counsel was quite well prepared for [the expert's] testimony and launched a vigorous attack on it at trial. [The defendant] has at most pointed out minute variances between plaintiff's pretrial paraphrasing of the [expert's] testimony and the actual [expert's] testimony. Such quibbling on [the defendant's] part does not support a grant of judgment n.o.v. or a new trial.").

On cross-examination, Perrone admitted that his reports did not specifically identify a head strike. *See* App. I p. 466 l. 22—p. 467 l. 17. Perrone did, however, testify that the head strike mark was "documented," "marked" and "describe[d]" in his report. *See* App. I p. 467 l. 9–10.

Indeed, although Perrone's report of May 30, 1991 did not specifically state that Julia's head came into contact with the roof of the Trooper, nor that this contact was the mechanism for Julia's injury, it defies both logic and common sense for the defendant to argue that it was not aware that Perrone would testify that Julia's injury was caused when her head hit the roof. On page three of his report, Perrone opines that "[b]oth of the vehicles' occupants suffered similar injuries which were associated with a significant force component being applied to their spinal column during the rollover portion of the accident." App. V p. 40 l. 9–12. While Perrone does not specifically state that the direction of this "significant force component" was "top down,"

---

**17.** The court also notes that the defendant was offered additional time to prepare to meet the plaintiff's new thrust. *See* App. IV p. 95 l. 5–17. The defendant declined to avail itself of this opportunity.

**18.** In a trial of this complexity, occasionally exhibits which were not disclosed in the pretrial process will surface. During this trial, some exhibits which were not identified during discovery were admitted on behalf of the defendant. *See* App. III p. 36 l. 7—p. 37 l. 8.

**1224**

he criticizes the roof design used in the Trooper no less than four times on that page of his report. Indeed, Perrone even went so far as to say that "[i]f the Trooper II had a tilt lock-latch mechanism such as existed in many millions of American vehicles, then the lap belt portion of the restraint system would have maintained its fixity *and permitted much less occupant motion relative to the roof of the vehicle during the rollover."* App. V p. 40 l. 23–28 (emphasis supplied).

Having received this report, the defendant's argument that Perrone's pre-trial reports did not specify either the direction of force or the mechanism of injury amount to mere "quibbling." Although it might have been preferable for Perrone to have stated explicitly his conclusion that Julia's injury was caused by her head hitting the roof, the defendant was on notice that this would be the substance of Perrone's testimony.

Since it was on notice as to the substance of the opinions which would be offered at trial, the defendant had ample time to prepare its response to the plaintiff's experts. If the defendant thought it needed still more time, it could have requested a recess in the trial. *See* App. I p. 293 l. 3–6 ("THE COURT: I'll give you a call back if there is a problem. You have plenty of time— we're going to have a hiatus of two weekends, plus Wednesday, Thursday and Friday. You can certainly get ready in time."). Since the defendant did not request a recess, it cannot now complain that it lacked the time to prepare effective cross-examination.

The fact that the defendant was not provided with a "pre-circled" Exhibit P–36 prior to trial does not mean that the trial was unfair. The defendant's cross-examination of Perrone immediately after he circled the alleged head strike mark on P–36 was immediate, detailed, and probing. *See* App. I.

p. 466 l. 3—p. 467 l. 13. The defendant was also prepared to offer testimony discrediting Perrone's use of P–36 in its case-in-chief. *See* App. III p. 36 l. 3—p. 38 l. 21. *See also* App. IV p. 86 l. 11—p. 89 l. 10 (defendant's rebuttal).[19] In light of the defendant's reaction to Perrone's identification of the alleged head strike mark, the court cannot perceive any error or prejudice in the proceedings.

■ Finally, Perrone was qualified at trial to render an opinion as to the mechanism of Julia's injury. Perrone testified that much of his work in the Navy had related to biomechanics, specifically to the causes of skull fractures. *See* App. I p. 372 l. 13–23. He also testified that he had lectured on the biomechanics of vehicle impact. *See* App. I p. 376 l. 11–15. Given this background, and given the documents Perrone reviewed prior to forming his opinion, *see* App. I p. 412 l. 20—413 l. 23, Perrone was qualified to opine that Julia was injured when her head came into contact with the roof of the Trooper during the rollover.

## H. The Qualification of Benjamin Kelley to Testify as to the Significance of the FARS Data and FMVSS 209

■ The defendant claims that it was error for the court to allow Benjamin Kelley to testify as to the policies behind FMVSS 209 [20] and the significance of certain Fatal Accident Reporting System ["FARS"] data. While the defendant is correct when it asserts that a doctoral degree does not confer upon the bearer an absolute right to testify,[21] the federal courts have maintained a liberal policy of admitting expert testimony. *See In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829, 856 (3d Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1584, 113 L.Ed.2d 649

---

**19.** This testimony was apparently effective since the plaintiff changed its position during rebuttal. Ironically, the defendant claims that this shift in the plaintiff's position also constitutes error. *See* Section F., *supra.*

**20.** FMVSS (Federal Motor Vehicle Safety Standard) 209 sets forth the minimum requirements for seatbelts.

**21.** *See In re Air Crash Disaster at New Orleans, La.,* 795 F.2d 1230, 1234 (5th Cir.1986) ("Our message to our able trial colleagues: it is time to take hold of expert testimony in federal trials.").

(1991); *Roe*, 855 F.2d at 155; *Loughman*, 740 F.Supp. at 1123. This is because, once the court decides that the expert's testimony would be helpful to the jury, the jury is entitled to evaluate the testimony. *See In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir.1986); *Roe*, 855 F.2d at 155 ("Helpfulness is the touchstone of Rule 702.") (citation omitted); Fed.R.Evid. 702. The court has broad discretion in determining when an expert is qualified to render a helpful opinion. *See Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir.1987); *Aloe*, 816 F.2d at 114; *Shipp v. General Motors Co.*, 750 F.2d 418, 422 (5th Cir.1985).

In its Memorandum, the defendant seems to take the position that Kelley lacked the educational qualifications to render expert opinions as to the policies behind FMVSS 209 and the FARS data. In so arguing, the defendant overlooks that portion of Fed.R.Evid. 702 which provides that a witness may be qualified as an expert on the basis of "knowledge, skill, experience [or] training." Fed.R.Evid. 702. *See also Aloe*, 816 F.2d at 114. During voir dire, Kelley testified that he had spent two years in a senior position with the Federal Motor Vehicle Safety Regulatory Program during which time his duties were to make and carry out regulatory policy. *See* App. I p. 158 l. 18–23. *See also* App. I p. 160 l. 13—p. 161 l. 4, App. I p. 177 l. 19—p. 178 l. 2.

On the basis of this experience, and the knowledge and training Kelley gained while he held this position, the court allowed him to testify as an expert on government automotive regulations and safety policy. The court explicitly ruled that scientific training was not needed to testify in this area. *See* App. I p. 184 l. 15–16. In addition, the court warned the jury that Kelley was not a trained scientist, and that the jury should pay careful attention to the basis upon which Kelley rested his conclusions. *See* App. I p. 185 l. 6–16. The court also offered to give cautionary instructions relating to the FARS data. *See* App. I p. 152 l. 12–13; App. I p. 153 l. 2–9.

Given Kelley's background, he was qualified to testify as to what FMVSS 209 required. *See* App. I p. 188 l. 17—p. 189 l. 1. While Kelley was not allowed to testify to medical conclusions, *see* App. I p. 189 l. 16–22, or to technical design characteristics, *see* App. I p. 178 l. 1–2 (Kelley admitting that he does not have technical expertise), the goals and policies of FMVSS 209 do not fall into those categories. Similarly, having made automotive safety policy, Kelley was qualified to explain the significance of a database containing information concerning automotive safety. *See* App. I p. 193 l. 19—p. 194 l. 6. He was not qualified to give technical opinions based on the FARS data, nor did he attempt to do so. Given Kelley's experience and the scope of his testimony, the defendant has no basis to complain.

**I. Alan Cantor's Qualification to Express Expert Opinions As to Causation**

The defendant contends that Alan Cantor was not qualified to express opinions as to the cause of Julia's injuries, and that his testimony should have been limited to technical engineering issues. After reviewing the record, the court is satisfied that Cantor was qualified to express the opinions he did.

Cantor testified that his background lies principally in engineering, and that he specializes in "occupant crash protection." *See* App. II p. 48 l. 17—p. 49 l. 1. He also testified that he had extensive experience working with the military designing ejection seats and other crash protection devices. *See* App. II p. 50 l. 6 p. 52 l. 20. The defendant's objection arises out of certain statements Cantor made during voir dire. Specifically, Cantor testified that

> I do consistently say that I do not talk about what happens inside the body, I do not talk about what specifically breaks a specific bone. I normally talk about what are the types of things that cause injuries to regions of certain bodies. I look at the body from the outside in, rather than looking at injuries from the inside out.

App. II p. 78 l. 12–18. From this, the defendant concludes that Cantor is not a

biomechanical expert, *see* App. II p. 78 l. 20—p. 79 l. 23, and that he should not have been allowed to opine that Julia's injuries were caused by her head coming into contact with the roof of the Trooper during the rollover. *See* App. II p. 104 l. 16—p. 106 l. 16 (defendant's objection to Cantor's opinions regarding causation); App. II p. 175 l. 18–25 (same).

The defendant's objection to Cantor's testimony is based on an artificial (and unrealistic) distinction between an engineering and a biomechanical expert. Although the defendant disagrees with the substance of Cantor's opinions, the defendant concedes that Cantor was qualified to render opinions regarding the engineering aspects of seatbelt systems. What the defendant does not seem to understand is that, in this context, injury causation and engineering are inexorably intertwined. An engineer could not testify as to whether a seatbelt system was safe without knowing what injuries would result if the seatbelt system were used. Engineering, like torts, cannot be left "floating in the air."

An engineer can have the requisite knowledge to render opinions regarding the safety of various systems without possessing a detailed knowledge of anatomy. Cantor explained this when he stated

> I could—I have predicted that there would be an injury happening to, for example, the C2–C3 vertebrae area would be where my prediction would end, but I would not be able to—would not predict whether that C2–C3 injury would be a fracture of the anterior wedge of the body or the posterior edge of the body or whether it would involve the laminae or the pedicles of the spine.

App. II p. 176 l. 9–15. Thus, Cantor had knowledge of, and experience in predicting, the *type* of injury which would occur if a given seatbelt was used, even if he could not predict the *exact* injury which would occur. Cantor was, therefore, qualified to testify as to what types of injuries he would expect to see if certain seatbelts were used, and that the injuries Julia received were caused by the seatbelt design.

### J. The Evidence of What Injuries Julia Would Have Sustained Had an Alternative System Been Used

■ In order to establish a prima facie case, the plaintiff had the burden of showing what injuries she would have received had an alternative, safer seatbelt design been used in the Trooper. *See Huddell,* 537 F.2d at 737. Testimony on this issue was proffered by Perrone and Cantor. Perrone testified that, had the alternative, safer design been used, Julia would not have sustained a spinal injury. *See* App. I p. 460 l. 17–19 ("Yes, that if she had any of those belt systems or devices she would not have suffered a spinal cord injury, that's correct."). Cantor testified that, had the alternative, safer design been used, he "would expect bumps and bruises and nothing severe to the spinal area at all. Possibly some leg injuries, but the spinal area should have been protected." App. II p. 178 l. 3–5. Given the quantitative and qualitative differences in damages between paraplegia and less severe injuries, such as those suffered by Kathleen Herbison (i.e. bumps, bruises, and broken bones, but with no permanent damage or paralysis), this testimony allowed the plaintiff to claim full recovery under *Huddell.*[22]

Naturally, the jury was not required to believe the testimony given by Cantor or Perrone. *See Huddell,* 537 F.2d at 736 n. 4 ("Of all forms of evidence, opinion evidence is the weakest and least reliable. Even though uncontradicted it need not be accepted.") (citations omitted). Because of the unique qualities of expert testimony, the court informed the jury at the outset of the case that "one of [its] functions is to sit here as super-experts and evaluate what real experts say to you and then your obligation will be to determine whether the expert testimony is helpful to you, whether you want to accept it or reject it." App. I p. 4 l. 20–24. By its verdict, it is apparent that the jury believed Perrone. The court will not disturb this finding. *See Ayoub v. Spencer,* 550 F.2d 164, 169 (3d Cir.), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2952, 53

---

**22.** The court summarized this position to counsel during the trial. *See* App. III p. 299 l. 12–25.

L.Ed.2d 1079 (1977); *Huddell,* 537 F.2d at 737 ("Certainly, the credibility of opinion evidence is for the fact finder.") (citation omitted).

The defendant also assigns as error a statement made during closing in which the plaintiff represented to the jury that both Perrone and Cantor testified that, had the alternative, safer seatbelt been used, Julia would have only suffered bruising. *See* App. IV p. 186 l. 1–14. The defendant points out that this testimony was only given by Cantor, and urges that it was error to allow the plaintiff to give the jury the impression that this testimony was also given by Perrone. While it is true that counsel for the plaintiff was incorrect when he made this statement, his error was harmless.[23] The court finds that plaintiff's characterization of Perrone's testimony, while being "poorly supported," is supported by Perrone's statement that, had an alternative seatbelt been used, Julia would not have suffered a spinal injury. *See* App. I p. 460 l. 17–19. Since the plaintiff's statement does find some support in the record, the characterization of Perrone's testimony did not taint the proceedings. *See Matthews,* 871 F.2d at 278 ("Not every improper or poorly supported remark made in summation irreparably taints the proceedings."). The jury was instructed that the arguments of the lawyers were not evidence, and that it was the jury's recollection of the evidence which was controlling. *See* App. IV p. 123 l. 16—p. 124 l. 5.[24] Especially in light of the minor nature of the plaintiff's misstatement, the court is confident that the jury was not mislead.

It is true that after a three week trial, plaintiff's counsel made a minor error recalling testimony that had been given weeks previously. The court, rather than granting a new trial, is amazed that counsel could remember the testimony well enough to make only a single error. Even

if counsel are receiving daily copy of the trial transcript, the court does not, and indeed it can not, impose on counsel the burden of memorizing every word uttered by every witness. In addition to determining the credibility of witnesses, the jury's function is to determine what the various witnesses said. If the jury's memory is unclear, it can request the trial transcript to refresh its collective recollection. Not only was this jury instructed as to its ability to do so, it actually availed itself of the opportunity on two separate occasions. *See* App. IV p. 207 l. 2—p. 209 l. 20. *See also* App. III p. 282 l. 15–23 (THE COURT: Let me say this, I don't remember that, I have notes on Whalen's testimony. I don't remember what Whalen said about bruising. I'll leave that to you [the jury]. If, at any time, you have a question about a witness's testimony, you'll tell us what you want to hear, Kris can find it on her tape and replay it for you if you think it's important. Then the lawyers can ask Kris to do that also. But for our purposes, we'll allow the questions to be asked, if there were [sic] bruising. Whether or not there was is up to you."). For this reason, the court is confident that the misstatement by plaintiff's counsel did not taint the proceedings in any way.

## K. Julia's Position in the Car at the Time of the Accident

The defendant takes issue with the plaintiff's contention that, after the accident, Julia's feet were sticking out the passenger window. There was, however, evidence from which the jury could have made such a finding. William Whalen, the Emergency Medical Technician who responded to the accident, testified that Julia's feet were located in "the passenger side door window area." App. I p. 127 l. 19–21. *See also* App. I p. 129 l. 22—p. 130 l. 6 (describing

---

**23.** Courts holding that it is improper for counsel to refer to matters not in the record during an argument qualify their holding by stating that "[r]eversible error is committed when counsel's closing argument to the jury introduces extraneous matter which has a reasonable probability of influencing the verdict." *Ayoub,* 550 F.2d at 170 (citations omitted). Counsel's misstatement

of the record during closing can therefore be harmless.

**24.** It must be noted that the court gave the jury a similar instruction when the plaintiff claimed that the defendant was misstating the record. *See* App. II p. 313 l. 16—p. 314 l. 7.

the steps needed to extract Julia from the Trooper given her position). From this testimony the jury could conclude that the seatbelt did not restrain Julia during the rollover, and that at the conclusion of the accident her feet were protruding from the window.

In arguing that Julia was properly belted in after the accident, the defendant relies on testimony by Kathleen Herbison, the passenger in the car Julia was driving. Kathleen testified that she "perceived that part of [Julia's] body was in the seat belt [sic] and all I—I could tell that her head was above me." App. I p. 12 l. 8–9. In relying on such testimony, the defendant ignores the fact that Kathleen explicitly stated that only *part* of Julia's body was in the seatbelt.[25] From this the jury could infer that the seatbelt had slipped off Julia's pelvis, in violation of FMVSS 209. Additionally, in the next breath Kathleen testified that there was no light when she observed Julia. *See* App. I p. 12 l. 10–15. The jury was certainly entitled to discount the testimony of a witness who had just been involved in an automobile accident and was now staring up into darkness.

Likewise, the jury could have discounted the testimony of Benner–Smith. The defendant argues that Benner–Smith, the first person on the scene of the accident, testified that Julia had been restrained by her seatbelt. While Benner–Smith did testify that he had to release Julia from the seatbelt, *see* App. I p. 106 l. 22—p. 107 l. 3, he did not testify as to where her feet were located before he released her. *See* App. I p. 117 l. 8 ("I couldn't see her lower body."). Indeed, Benner–Smith never testi-

fied that Julia was *tightly* restrained by her seat belt. *See* App. I p. 114 l. 14–17. From this the jury could conclude that, while the seatbelt did not break, it did not restrain Julia tightly during the rollover, and that it allowed her to slip and come into contact with the roof.

## L. Use of the NCAP Tests

■ At trial, the plaintiff proffered videotapes of, and expert testimony relating to, government run NCAP tests.[26] *See* App. II p. 168 l. 19—p. 175 l. 15. The defendant objected, arguing that the NCAP tests were not substantially similar to the rollover accident in question. *See* App. II p. 168 l. 20.[27] The court overruled this objection, holding that the defendant's argument regarding the lack of similarity between the NCAP tests and the accident in question went to the weight of the evidence. *See* App. II p. 168 l. 24—p. 169 l. 2.

In so ruling, the court implicitly made the threshold determination that the NCAP tests were similar enough to the accident in question to be of some value to the jury. Such a ruling is within the court's discretion. *See Swajian v. General Motors Corp.*, 916 F.2d 31, 36 (1st Cir.1990) ("The decision of whether to admit or exclude videotaped [testing] evidence is left to the sound and broad discretion of the trial judge.") (citation omitted); *Roe*, 855 F.2d at 154–55; *Shipp*, 750 F.2d at 427. The defendant's challenge to the court's exercise of discretion must fail for two reasons.

First, there was evidence from which the jury could find that the accident in question involved a frontal impact. *See* App. I p. 99 l. 22—p. 100 l. 14 (Benner–Smith testifying

---

**25.** On cross examination, Kathleen reiterated that part of Julia was restrained by the seatbelt, and that Julia was "dangling." *See* App. I. p. 17. l. 5–9.

**26.** NCAP [New Car Assessment Program] tests are mandated by the United States Government. Although it is not necessary to test every vehicle every year, a procedure exists whereby vehicles are "rotated" through the tests. The NCAP tests measure the damage sustained by a vehicle (and a "dummy" simulating a driver and a passenger) after a frontal impact with a stationary barrier. The collisions usually involve speeds of thirty or thirty-five miles an hour.

**27.** The court finds it interesting that the defendant wishes the court to take a restrictive approach to the admissibility of expert testimony. The defendant did not take such a position during the court's *in limine* hearing regarding the testimony of Dr. John Spikes, the defendant's alcohol expert. Following the *in limine* hearing, the court overruled the plaintiff's objections that Dr. Spikes' testimony was 1) not reasonably supported by evidence generally relied upon by experts of that type; 2) not relevant to the case at bar; and 3) overly prejudicial. *See* App. III p. 166 l. 8—p. 203 l. 3 (testimony of Dr. Spikes).

that the front of the Trooper came into contact with the ground during the rollover). This testimony laid a foundation for the introduction of frontal-impact data.

Second, the NCAP data was probative of the performance of the Trooper's seatbelt.[28] Although the NCAP tests were not identical to the accident, they were similar enough to aid the jury in determining what happened to Julia. *See Shipp*, 750 F.2d at 427 (approving of the admission of vertical drop tests in a rollover accident case, and holding that differences in the conditions simply affected the weight the jury should accord the evidence).

In addition to being probative, the court finds that the differences between the NCAP tests and Julia's accident were so obvious that there was no danger of confusing the jury. *See* App. II p. 174 l. 17–21 (Cantor testifying about the differences between the NCAP tests and a rollover). Even so, the court would have given cautionary limiting instructions, had the defendant requested them. *See* App. I p. 61 l. 2–21.

M.   Use of the "Trooper-on-a-Spit" Tests

Similarly, the defendant argues that the court should have excluded the "Trooper-on-a-spit" tests performed by Cantor. In these tests, rather than installing alternate seatbelts in a Trooper, Cantor used a safety clip from a child's car seat in order to simulate the performance of alternate seatbelt systems. *See* App. II p. 117 l. 4–15. Test dummies were then placed in the Trooper, and the Trooper was rotated over a two minute period in order to simulate a rollover (hence the moniker "Trooper-on-a-spit"). *See* App. II p. 115 l. 11—p. 116 l. 8. The defendant claims that the introduction of these tests was prejudicial error since

Cantor admitted that the testing "was not a re-creation of this accident." App. II p. 114 l. 8–9.[29]

Again, in order to refute the defendant's argument, the court need do no more than read the next sentence. Cantor went on to state that the test "was a physical comparison of systems under the types of forces that would be seen worse in a rollover accident." App. II p. 114 l. 10–11. A test need not be identical to the case at bar in order to be admissible; the test need only be similar enough to be helpful to the jury. *See Brandt v. French*, 638 F.2d 209, 212 (10th Cir.1981). This test was similar enough to aid the jury in its quest for the truth.

Indeed, Cantor testified that the reason he performed the tests in the manner in which he did was in order to isolate the performance of the seatbelt. *See* App. II p. 114 l. 17–20; App. II p. 116 l. 1–8 ("we usually take two minutes because two minutes, if you do it in less than two minutes you're putting other effects into the test and you want to do it very slowly so that you can just isolate belt performance. You don't want to start throwing the bodies around because that changes what you're trying to do. So the slowness of the test is very important in doing the comparison of one seatbelt to another."). He also testified that, in his opinion, the use of the clip for testing purposes was preferable to installing alternate seatbelt systems. *See* App. II p. 117 l. 9–12 (relating to the use of the clip); App. II p. 125 l. 14–17 ("And this is the child's seat clip that we used and we did things that we felt were in accordance with engineering practices for this type of testing and was in accordance with industry standards."); App. II p. 196 l. 15—p.

---

28. The defendant makes much ado about Cantor's statement that "these [NCAP] tests indicated that this seatbelt system was not matched to the Isuzu Trooper for other types of crashes." App. II p. 170 l. 4–6. If the defendant would simply read the next line of testimony, it would see that Cantor then testified that "Ms. Dorsett had a *frontal crash* somewhere in the sequence, she obviously had some spoolout or motion put into her before she got into the rollover based on the type of performance we see from this

system." App. II. p. 170 l. 6–10 (emphasis supplied). This testimony provided another foundation for the introduction of the NCAP data.

29. The defendant did not raise this objection when Lee Carr, a defense expert, admitted that "the tests that [he] did here, [his] purpose was not to try to illustrate how this accident happened." App. II p. 332 l. 21—p. 333 l. 1. *See also* App. II p. 342 l. 18—p. 343 l. 9.

198 l. 17 (relating to why alternate systems were not installed in a Trooper for testing purposes); App. II p. 118 l. 3—p. 119 l. 16 (relating to the amount tension placed on the seatbelt); App. II p. 121 l. 8—p. 122 l. 17 (same).

As in the case of the NCAP tests, the differences between the Trooper-on-a-spit test and the accident Julia was involved in were obvious. Counsel for the defense was entitled to, and in fact did, point out these differences during cross-examination. *See, e.g.,* App. II p. 196 l. 10–19 (relating to Cantor's failure to install alternate seatbelt systems). The differences between the tests and the accident relate to the weight of the evidence, not to its admissibility. The fact that the jury may have accorded it more weight than the defendant would have does not mandate the grant of a new trial.

### N. The Plaintiff's Use of Rebuttal Testimony

■■■ The defendant claims that it was prejudiced by the plaintiff's improper use of rebuttal. Specifically, the defendant claims that the court erred in allowing Cantor to change his testimony with respect to the location of the "head strike" (discussed in Section F., *supra* ) and with respect to the mechanism by which Julia was injured. "It is well settled that evidence which properly belongs in the case-in-chief but is first introduced in rebuttal may be rejected, so as to avoid prejudice to the defendant and to ensure the orderly presentation of proof." *Emerick v. U.S. Suzuki Motor Corp.,* 750 F.2d 19, 22 (3d Cir.1984). Since the defendant has failed to point to any topics which were introduced for the first time during rebuttal, a new trial is not warranted.[30]

The topics Canter testified to had been covered in the plaintiff's case-in-chief, and had been challenged during the defendant's case. Rather than being recalled to reiterate his testimony (something that the court would not have permitted),[31] Cantor was recalled to give new testimony on the topics which had been covered earlier. The fact that Cantor's rebuttal testimony contradicted, in whole or in part, the testimony he proffered during the plaintiff's case-in-chief does not constitute error on the part of the court. While this probably did constitute a tactical error on the part of plaintiff's counsel, this is not a ground upon which a new trial can be granted. It is, however, fertile ground for cross-examination by the defendant. As a matter of fact, the defendant exploited this opportunity to the best of its ability. *See* App. IV p. 73 l. 3–7; App. IV p. 77 l. 5—p. 78 l. 13.

Despite the defendant's best efforts to point out the inconsistencies in Cantor's testimony, the jury was still free to credit Cantor, in whole or in part, and find for the plaintiff. The court cannot say that the record is devoid of the "minimum quantum of evidence from which a jury might reasonably afford relief." *Keith,* 909 F.2d at 745 (citation omitted). *See also Andrews,* 895 F.2d at 1478; *Bhaya,* 832 F.2d at 259; *Aloe,* 816 F.2d at 113; *Grace,* 700 F.Supp. at 1387. For this reason, the jury's verdict will be allowed to stand.

### IV. *Conclusion*

The defendant's final argument in support of its Motions is that, when considered in its totality, the trial was not fair. The court disagrees. Each argument proffered by the defendant has either been rejected or found to be harmless. For this reason, a new trial is not warranted. *See Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 57 (3d Cir.1989). The defendant was afforded ample opportunity to present its case to the jury, and the jury's verdict is supported by the evidence. While the court does not believe that its rulings at

---

30. The court admits that it did, as is its practice, allow the plaintiff latitude in rebuttal. The same latitude, however, was extended to the defendant. *See* App. IV p. 91 l. 17–21. The court is not aware of any case holding that it is error to allow able counsel latitude to try a case in the way they see fit.

31. *See* App. IV p. 59 l. 13–16 ("THE COURT: Anything new about the head print existence and whether it is a head print he may testify to. But he may not repeat his opinion. His opinion has been given."); App. IV p. 61 l. 21—p. 62 l. 7.

trial were erroneous, the court is confident that any error which might have resulted was harmless.

For the reasons set forth above, the defendant's Motions for JNOV or, in the alternative, for a New Trial, are denied.